[Nos. G038734, G039274, G039624. Fourth Dist., Div. Three. June 8, 2009.]

AUGUST B. DOPPES, Plaintiff and Appellant, v.
BENTLEY MOTORS, INC., Defendant and Respondent.

968

**COUNSEL**

Buchalter Nemer, Steven Brower, Robert M. Dato; Law Offices of Jeffrey S. Benice and Jeffrey S. Benice for Plaintiff and Appellant.

Kaplan Lee, Jonathon Kaplan, David A. Goldsmith and Yitz E. Weiss for Defendant and Respondent.

OPINION

FYBEL, J.—

## I.

### INTRODUCTION

In this case, we make the extraordinary, yet justified, determination that the trial court abused its discretion by failing to impose terminating sanctions against defendant for misuse of the discovery process. The record demonstrates defendant engaged in repeated and egregious violations of the discovery laws that not only impaired plaintiff's rights, but threatened the integrity of the judicial process.

August B. Doppes sued Bentley Motors, Inc. (Bentley), for violation of the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq.), breach of express warranty, breach of implied warranty, and fraud, after Bentley failed to repair, repurchase, or replace a 2001 Bentley Arnage that had an obnoxious odor in the interior. Over the course of litigation, Bentley persistently misused the discovery process, withheld documents, and violated four discovery orders or directives from the discovery referee. A report and recommendation prepared by the discovery referee just a few weeks before trial declared: "Although Bentley has been repeatedly ordered to provide full and complete discovery, Bentley has steadfastly failed to do so. [¶] The history of Bentley's failure to make discovery is chronicled in Plaintiff's numerous discovery motions."

The discovery referee, in an abundance of caution and with exercise of great moderation, recommended denying Doppes's request for terminating sanctions and instead recommended giving the jury a special instruction as a form of issue sanctions.

The trial court did not abuse its discretion in approving the discovery referee's report and recommendation. However, in the middle of trial, it was learned Bentley still had not complied with discovery orders and that Bentley's discovery abuses were worse than originally known. Rather than grant Doppes's renewed request for terminating sanctions, the trial court gave another special instruction regarding Bentley's discovery practices. As we shall explain, at that point, the trial court erred by not imposing terminating sanctions against Bentley.

The jury found in favor of Doppes on his causes of action under the Song-Beverly Consumer Warranty Act and for breach of express and implied

warranties. The judgment on those claims is affirmed. The jury found against Doppes on his fraud cause of action and made a finding that Bentley did not intentionally violate the Song-Beverly Consumer Warranty Act. As sanctions for Bentley's discovery abuses, we reverse the judgment on the fraud cause of action and remand with directions to enter Bentley's default on that cause of action, to make a finding to be entered on the judgment that Bentley intentionally violated the Song-Beverly Consumer Warranty Act, and to consider civil penalties and other relief against Bentley.

Doppes also contends the trial court abused its discretion in failing to award him the full amount of attorney fees sought in two motions. We conclude the amount of attorney fees awarded on the first motion must be increased to compensate Doppes for the cost of discovery motions, but otherwise affirm the trial court's award. We remand with directions to the court to reconsider the second motion in light of this opinion.

## II.

### FACTS AND PROCEDURAL HISTORY

#### A. The "Obnoxious Odor" Problem

In April 2002, Doppes purchased a new, model year 2001, Bentley Arnage automobile from Newport Auto Center (NAC). Soon after purchasing the automobile, he noticed an "obnoxious odor" in its interior. At Doppes's request, NAC tried unsuccessfully to repair the car on several occasions, resulting in the car being out of service for 171 days. Doppes demanded that Bentley replace the car or make restitution in accordance with Civil Code section 1793.2, subdivision (d)(2) (part of the Song-Beverly Consumer Warranty Act). Bentley refused.

An internal Bentley document issued June 7, 2001, entitled "Odour Reduction & Rear Seat Belt Draft Reduction Procedure," states: "Obnoxious odour present in the passenger compartment when the vehicle is driven with the sunroof tilted or the door drop glass lowered 1 to 2 inches from the glasses['] fully raised position. The odour is also detected in the luggage compartment at a higher concentration." Doppes was not informed of this document or of the information in it when he purchased his Bentley automobile.

#### B. The Better Business Bureau Hearing

Doppes first sought relief from the Better Business Bureau. At a hearing before the Better Business Bureau in March 2004, Bentley employee Colin

Ham[1] testified that, as of that date, he knew of only three cars with odor problems and that Bentley addressed the problem by placing foam blocks in the body cavities of the cars to obstruct the flow of cold air. Ham also testified he instructed NAC not to provide Doppes with internal documentation of the odor problem. The Better Business Bureau hearing officer ruled in Bentley's favor.

Documents produced later showed that Ham knew of at least 11 odor complaints by March 2004, and knew the problem was not cold airflow but odor emanating from corrosion protection wax. Documents showed too that, by June 2001, Bentley knew of an obnoxious odor problem in all of its four-door cars for model year 2001. The odor emanated from the corrosion protection wax and entered the passenger cabin from the "body shell box sections." Bentley created a service kit to reduce the odor, but "[d]ue to [the] complex nature of the odour reduction procedure and the limited number of kits," they were released to dealers on a restricted basis only.

### C. *Doppes's Lawsuit and the Document Request*

Later in 2004, several months after the Better Business Bureau hearing, Doppes filed his initial complaint against Bentley and NAC. The operative complaint became the third amended complaint, filed in August 2005, which alleged seven causes of action: (1) damages and civil penalties under the Song-Beverly Consumer Warranty Act; (2) breach of express warranty; (3) breach of implied warranty of fitness; (4) fraudulent concealment; (5) fraudulent misrepresentation (against NAC only); (6) fraudulent concealment (against NAC only); and (7) breach of contract (against NAC only). The third amended complaint sought damages of no less than $192,736.49, a civil penalty of two times the amount of actual damages, punitive damages, rescission, and attorney fees.

In October 2004, Doppes served Bentley with a deposition notice of Bentley's person most knowledgeable of all warranty complaints concerning the Bentley Arnage for the 2001 and 2002 model years, including those related to the rust inhibitor used on the car frames. Doppes also requested Bentley to produce all documents relating to (1) customer complaints concerning the rust inhibitor used on the 2002 Bentley Arnage; (2) all notices to Bentley dealers for the period 2001 to date concerning the rust inhibitor used on the Bentley Arnage; (3) all warranty repairs during the period of January 2002 to date of the Bentley Arnage related to the rust inhibitor used on the

---

[1] Ham was employed by Bentley and its predecessor company until he retired at the end of June 2005. After retiring, Ham served as a consultant to assist Bentley's counsel in this litigation.

vehicle; (4) all customer complaints of a wax oil smell caused by the rust inhibitor on the 2002 Bentley Arnage; and (5) vehicle tests conducted on the 2002 model year Arnage to confirm whether there was a wax oil smell arising from the vehicle's rust inhibitor.

### D. The First Motion to Compel Attendance and to Produce Documents

In May 2005, Bentley produced Ham as its person most knowledgeable in response to the deposition notice. Ham brought with him only certain documents relating to the purchase and repair of Doppes's Bentley automobile and brought no documents concerning customer complaints of odor.

In response, Doppes moved to compel attendance of the person most knowledgeable at the deposition and the production of documents. The trial court granted the motion on June 28, 2005. In the formal order entered July 20, Ham was ordered to appear for his deposition on August 17 and to produce documents on or before August 9. At that time, no sanctions were awarded.

### E. Bentley Fails to Comply with the Order to Produce

Bentley did not produce any documents by the court-ordered production date of August 9, 2005. Instead, in a letter dated August 19, 2005, Bentley's counsel represented it was producing some responsive documents but it "was required to develop a system to query its warranty computer" in order to comply with the discovery order. Bentley's counsel stated, "[w]ith this correspondence, we have produced documents containing lists of warranty claims and the corresponding vehicles identified by chassis number."

In a letter dated August 30, 2005 (21 days beyond the court-ordered production date), Bentley's counsel wrote: "As we have told you on numerous occasions, the scope of your document requests will require an extremely voluminous and time consuming production. We set forth a sequence for such a production in written correspondence and clarified questions you had regarding that correspondence in a subsequent conversation. If you do not agree with our proposal (as we thought you indicated you had), we ask that you set forth an alternate proposal." Notwithstanding a court order compelling Bentley to produce documents by August 9, its counsel stated, "We cannot, however, produce all responsive documents immediately. That is why we proposed a staggered production in an orderly manner. We are, however, willing to produce the documents in any other reasonable manner. Please understand, though, that we have already embarked on retrieval of documents in the manner set forth in our correspondence. Changing the sequence of

retrieval of documents and production will add to the time necessary to fulfill the request." Also on August 30, Bentley sent a two-page document, under separate cover, which purported to be "tier-two documents relative to the body cavity odor complaints."

In a letter dated September 8, 2005, Bentley's counsel wrote: "The tier-3 and tier-4 documents relative to the body cavity odor complaints and responsive to your document requests in the above-referenced matter consist of approximately 250 pages. As requested earlier, please advise whether you would prefer production of the originals . . . for inspection and copying." With a letter dated September 9, Bentley's counsel enclosed "documents labeled BMI 2200 through BMI 2446, inclusive, which represent the tier-3 and tier-4 body cavity odor complaints."

In a letter dated October 3, 2005, Bentley's counsel represented Bentley had "produced the majority of documents responsive to the request for production of documents subject to the Order of the Court related to body cavity odor complaints. . . . [¶] . . . [Y]ou may now assume all documents will be produced no later than Thursday of this week." In a letter dated October 6, Bentley's counsel wrote, "[w]e have now sent your offices all documents responsive to the Request for Production included in the October 21, 2004 Notice of Deposition . . . and that are subject to the July 20, 2005 Order of the Court."

However, in a letter dated November 4, 2005, Bentley's counsel conceded Bentley had not produced all responsive documents and represented, "[w]e will broaden our search for e-mail correspondence that could be responsive to the categories of documents requested in the Notice of Deposition." In correspondence dated November 21, Bentley's counsel acknowledged Bentley had not produced all documents "relative to repurchase of 2000, 2001, and 2002 Arnage Motorcars due to body cavity odor complaints" because of privacy concerns. In essence, over a year after Doppes's original document request and four months after the discovery order, Bentley acknowledged it had not fully complied with the court order.

F.   *The First Motion for Terminating Sanctions and the Second Motion to Compel Production of Documents*

Doppes moved for terminating sanctions against Bentley for misuse of the discovery process. The trial court's tentative ruling, posted November 1, 2005, stated: "Disobeying a court order to provide discovery constitutes a misuse of the discovery process. Bentley Motors has produced all the documents, albeit two months after it was ordered, and 'has fallen on its sword.' . . . Monetary sanctions are warranted. I am still considering how

much and against whom." (The record does not include the trial court's final ruling, but Bentley does not dispute Doppes's representation the trial court ordered Bentley to pay monetary sanctions.) Bentley does not dispute Doppes's assertion it *"never* produced all documents responsive to the first court order in advance of Ham's court-ordered deposition."

In early December 2005, Doppes again moved to compel Bentley to produce documents in compliance with the July 20, 2005 order and for monetary or evidentiary sanctions if Bentley again failed to comply. On December 15, the court granted the motion, ordered Bentley to produce documents responsive to seven categories no later than December 23, 2005.[2] The order stated: "If there are no documents responsive to any particular category identified above or if any responsive documents are not within Bentley's care, custody or control, then Bentley is ordered to provide a declaration to that effect under penalty of perjury and signed by both counsel and Bentley as to each specific category." The court deferred the hearing on Doppes's sanctions request to January 10, 2006.

Bentley did not produce any documents in response to this discovery order. Instead, Bentley submitted two declarations (one from its counsel and another from Richard Mills, a former customer service manager), stating no further production was required because "Bentley Motors, Inc. has produced all documents within its possession, custody or control."

## G.  *The Appointment of a Discovery Referee*

At the hearing on January 10, 2006, the trial court appointed a discovery referee. The parties agreed on the appointment of retired Court of Appeal Justice John Zebrowski as discovery referee.

On January 31, 2006, the discovery referee directed Bentley to produce documents responsive to eight categories, including all documents relating to odor complaints concerning four-door Bentley automobiles in model years 1999 to 2003, all documents regarding the origin of the odor problem, and all documents concerning the criteria or procedures for authorizing installation of the odor control kits.

---

[2] The court ordered Bentley to produce, among other things: (1) all dealer source documents to which Bentley had access pursuant to its dealer agreements; (2) all service orders on every Bentley Arnage repurchased because of complaints of the wax-oil burning smell; (3) all customer complaints on every Bentley Arnage involving the wax-oil burning smell; (4) all documents regarding court proceedings and/or Better Business Bureau hearings that involved complaints of the wax-oil burning smell; (5) all nonprivileged internal corporate documents reflecting communication about the wax-oil burning smell; and (6) all computer files that summarized customer complaints of the wax-oil burning smell.

In response to the discovery referee's directive, Bentley produced documents labeled BMI 17000 through BMI 17089 on March 6, 2006. The documents confirmed Bentley had received dozens of odor complaints, not just the three to which Ham testified at the Better Business Bureau hearing. Documents within the March 2006 production revealed Ham knew Bentley employee David Cartman had performed "extensive work" in connection with the odor problem as early as 1999 and showed Bentley often flew Cartman from the United Kingdom to North America to "assist, monitor and verify" the odor reduction effort.[3] Until this document production, neither Bentley nor Ham had identified Cartman.

### H.  *The Discovery Referee's June 5, 2006 Report*

On June 5, 2006, the discovery referee submitted his report to the court. On June 6, 2006, the trial court approved the report as drafted. The court's order included the following findings:

"1. The record establishes that defendant Bentley failed to timely produce relevant and properly demanded, but potentially damaging, documents. Document production was requested early in this case (in October 2004) and was ordered by the Court in July 2005. In December 2005, the Court again ordered document production. Yet some responsive documents were not produced until March 6, 2006, and then only in response to a directive from the undersigned Discovery Referee. As of March 6, 2006, trial was set for April 17. As a consequence of Bentley's tardy production, Plaintiff lacked sufficient time to prepare for trial. Following my recommendation, the Court continued the trial date to August 28, 2006.

"2. One repeated obstacle to full discovery in this matter has been a repeated, and legally erroneous, position taken by Bentley. Defendant Bentley Motors, Inc., (Bentley USA) insists that it is independent of Bentley Motors Ltd., a United Kingdom entity (Bentley UK). This may be true for some purposes in a certain technical sense, but not for purposes of discovery on the record in this case. The evidence preponderates that Bentley USA, in the normal course of business, regularly obtains documents from Bentley UK

---

[3] Cartman was in San Diego in January 2001 to remove wax oil and seal seams in an effort to reduce the odor from a 2000 Arnage. He was in Palm Beach, Florida, in September 2001 to "strip and rebuild . . . vehicle" in connection with an attempted odor reduction procedure, and oversaw "work carried out on vehicle to cure the wax odour problem" at a Bentley dealership in Houston, Texas. Document No. BMI 17018 concerned "repair of Waxoyl odour with support from Dave Cartman" at a Bentley dealership in Palm Beach. Document No. BMI 17019 described a dealer technician's experience with Cartman at a Cadillac dealership in Michigan in 2002: "Assisting David Cartman with the odour fix. Most of the stripping of the interior was done prior to D[avid] C[artman] arriving at the dealership."

when those documents are needed for business purposes. . . . It was apparently on this theory that Bentley USA delayed production of requested documents that were ordered produced.

"3. On January 31, 2006, I took an extraordinary step in an effort to move this case to trial on the then-set date of April 17. I issued directly to counsel a 'directive' that Bentley produce documents, and 'directed' Bentley either to comply or to notify me that it objected . . . . [¶] . . . [¶]

"4. In response to this 'directive,' documents were produced which appear to show, among other things, that Bentley has long been aware of an odor problem in a significant number of Bentley automobiles, and that personnel from the UK (specifically a Mr. Cartman) have been sent from the UK to the United States for the purpose of remediating odor problems. These documents were produced on March 6, 2006. [¶] . . . [¶]

"9. In addition to the difficulties interposed by Bentley with regard to depositions, it appears that many documents which have been requested, and must necessarily exist, have not been produced. The record leaves good reason to believe that Bentley is either withholding documents, or has failed to conduct a diligent search to find them. Perhaps these documents in fact do not exist, but in that event Bentley should provide, pursuant to [Code of Civil Procedure] §2031.230, a declaration or declarations detailing the efforts expended to locate such documents. No such detailed explanation has been provided.

"10. Plaintiff has thus been significantly prejudiced. First, Plaintiff has been delayed in the preparation of its case (and has incurred unnecessary expense). . . . Had Bentley produced documents disclosing its knowledge of the odor problem when first requested to do so, or later when first ordered by the Court to do so, or even when ordered to do so a second time by the Court, Plaintiff[] would most likely have had ample time to obtain the depositions of Messrs. Cartman and Morley . . . . Third, it still as of this date appears that Bentley has not produced all responsive documents."

In the June 6, 2006 order, the court agreed with the discovery referee the evidence and issue sanctions against Bentley were in order, but gave Bentley an opportunity to " 'cure' " the problems it had created. The court ordered Bentley to produce the following documents by June 25, 2006, or provide declarations describing in detail the efforts made to locate them: "(1) instructions on how to apply the rust inhibitor, (2) repair invoices or other records of odor reduction work and/or odor repair on all Bentleys from model years 1999 to . . . 2006, (3) all documents recording approval for installation of odor reduction kits for model years 1999 to 2006,

(4) all documents denying approval for installation of odor reduction kits for model years 1999 to 2006, (5) any correspondence (other than email) from Bentley dealers to Bentley USA or UK regarding customer odor complaints, (6) documents notifying dealers that odor reduction kits were available, (7) all responsive documents referenced in other documents produced, and (8) all other documents of any description referring or relating to the odor problem or complaints of odor in Bentley automobiles for model years 1999 to 2006."

The court order provided the discovery referee should consider the issue of sanctions if Bentley failed to comply with its June 6, 2006 order.

### I.   *The July 6, 2006 Hearing Before the Discovery Referee*

On July 6, 2006, the parties attended a hearing before the discovery referee to discuss all outstanding discovery issues. At the hearing, Bentley's counsel told the discovery referee that Bentley Motors Limited (Bentley's United Kingdom parent company) would not produce documents in response to the court's June 6, 2006 order. Instead, Bentley submitted declarations describing its efforts to locate documents. Mills submitted a declaration stating: "In or about early November 2005 it became apparent that plaintiff was seeking e-mail correspondence and/or electronic stored information regarding vehicle odor complaints and remediation. I therefore sent an e-mail . . . to all then current Bentley Motors, Inc. After-sales Managers and Regional Team Leaders requesting that each search their electronic records to determine whether any responsive documents existed. I received a negative response from each recipient of my e-mail correspondence." Ham submitted a declaration identifying a few more responsive documents, but otherwise declaring he found no responsive documents.

The trial court's June 6, 2006 discovery order required Bentley to provide access, via computer terminal, to its e-mail files to Doppes's attorney, Steven Brower, before June 25 and that Brower be permitted to "data-mine" the e-mail files for references to the odor problem and to copy e-mails referencing the odor problem. Bentley first arranged to give Brower access to its e-mail system through Deloitte & Touche, which had indexed the e-mails. Brower was allowed access only to a hard drive of e-mail that was downloaded from Bentley's computer system, and many e-mails appeared to be missing; for example, the "sent" folder of the Microsoft Outlook program dated back only 60 days, except for e-mails sent by Mills. Brower requested access to Bentley's e-mail files several times, but Bentley's attorney denied the requests.

*J. Doppes's Second Motion for Terminating Sanctions; the*
*August 23, 2006 Discovery Referee's Report and*
*Recommendation*

In August 2006, Doppes submitted a motion to the discovery referee requesting "a terminating sanction by an order rendering a judgment by default against Bentley." Alternatively, Doppes requested issue and evidence sanctions. Doppes supported his motion with 113 exhibits, chronicling the history of the discovery dispute. Doppes submitted a proposed recommendation with the discovery referee proposing the court instruct counsel and the jury that 33 issues of fact, identified in the proposed recommendation, be taken as established.

In his report and recommendation dated August 23, 2006, the discovery referee stated: "Aside from actually smelling the odor, the jury will have to rely on related information such as the frequency and level of complaints about the odor, possibly Bentley's evaluation of or admissions regarding these complaints, actions taken by Bentley in response to odor complaints, manufacturing processes that may have caused the odor, and the like. The evidence produced in these discovery proceedings preponderates that such information should be easily and clearly available (the available evidence so suggests and there is no reason to believe otherwise; certainly Bentley has not adequately explained its failure to provide full and complete evidence). Nevertheless, Bentley's discovery responses have not been complete and leave much in doubt. Although Bentley has been repeatedly ordered to provide full and complete discovery, Bentley has steadfastly failed to do so. [¶] The history of Bentley's failure to make discovery is chronicled in Plaintiff's numerous discovery motions. With trial set to commence on the third business day from now, time cannot reasonably be taken to restate this history in this report. Instead the history of Bentley's discovery obstruction can be found in Plaintiff's motions."

Nevertheless, the discovery referee recommended "a more moderate course" than the terminating sanctions or jury instructions sought by Doppes. The discovery referee stated:

"It is true that Plaintiff, this Court, and eventually the jury, have been deprived of certain discovery which should have been provided to shed light on the truth of this case. Nevertheless, erring (if at all) on the side of moderation, I believe that the major damage to Plaintiff's trial preparation can be repaired by certain narrowly-worded issue sanctions, while still allowing the jury to resolve this case on the merits (which will largely concern the jury's evaluation of the severity of the odor). Accordingly, I recommend that

issue sanctions be formulated with restraint, tending toward more narrow rather than toward broader sanctions, and that the jury be instructed as follows:

"Ladies and gentlemen, it will be your duty to determine the severity of the odor in Plaintiff's Bentley automobile. You must make that determination based on the evidence presented in this trial. However, you must also take as established and you may also consider the following matters:

"1. Prior to Plaintiff's purchase of his Bentley automobile, Defendant Bentley had actual knowledge that Bentley automobiles sometimes emitted an odor, described as a 'wax-oil' odor, that at least some customers found foul and offensive.

"2. Prior to Plaintiff's purchase of his Bentley automobile, Defendant Bentley had received complaints from customers about the 'wax-oil' odor. Although Bentley was ordered to provide its records concerning odor complaints, the precise number of odor complaints received by Bentley cannot be conclusively determined from the records provided by Bentley.

"3. The odor complaints received from customers were considered sufficiently significant by Bentley to cause Bentley to formulate an 'odor reduction kit' intended to eliminate the odor problem. Bentley's kit, however, did not completely eliminate the odor.

"4. Prior to Plaintiff's purchase of his Bentley automobile, Defendant Bentley had actual knowledge that the 'wax-oil' odor was caused by the rust inhibitor used on the automobile's metal framing.

"5. Defendant Bentley did not reveal any of this information to Plaintiff prior to Plaintiff's purchase of his Bentley automobile.

"6. A Bentley employee named Colin Ham inspected Plaintiff's Bentley automobile after Plaintiff had complained about the odor. After his inspection, Mr. Ham authorized the installation of Bentley's odor reduction kit in Plaintiff's Bentley automobile. Mr. Ham is known to have used email on Bentley's computer system. Bentley was ordered to produce copies of Mr. Ham's email for possible use in this trial. However, Bentley did not produce Mr. Ham's email records. Instead, Bentley explained that it had destroyed Mr. Ham's email records. These email records were destroyed, according to Bentley, even though this case (which you are now trying) was pending at the time the email records were destroyed. It is up to you, the jury, to determine what inference, if any, to draw from Bentley's destruction of email records.

"7. Bentley was also ordered to produce for inspection by Plaintiff the original email records of other Bentley employees. However, Bentley did not produce these email records. Instead, Bentley explained that it had destroyed these email records even though this case (which you are now trying) was pending at the time the email records were destroyed. It is up to you, the jury, to determine what inference, if any, to draw from Bentley's destruction of email records.

"8. Bentley *U.S.* is a corporation that *sells* Bentley automobiles in the United States. Bentley *U.K.* is a corporation that *manufactures* Bentley automobiles in the U.K., (and also sells them in the U.K.) It is Bentley *U.S.* that is the Defendant in this case.

"Bentley U.S. was ordered to produce additional records for your use in this trial, such as records concerning the method of application of the wax-oil rust inhibitor during manufacture of the automobiles in the U.K. Bentley did not produce such records. Instead, Bentley U.S. contends that it is unable to obtain such information from Bentley U.K.

"It is up to you, the jury, to determine whether it is true that Bentley U.S. is unable to obtain such information from Bentley U.K., even when such information is needed for normal business purposes. If you find that this is not true, and that Bentley U.S. can obtain such information from Bentley U.K. when such information is needed for normal business purposes, then you must determine what inference, if any, to draw from Bentley's failure to produce such information for use in this trial."

### K. *Discovery Continues After Trial Begins*

On August 28, 2006, the first day of trial, Doppes filed objections to the discovery referee's August 23 report and recommendation, objecting to the discovery referee's failure "to recommend each and every portion of the Proposed Recommendations," including the proposed jury instructions on 33 issues of fact. On August 28, the trial court heard extensive argument on the objections and overruled them. The trial court adopted the discovery referee's report and recommendation and denied Doppes's request for terminating sanctions.

On September 11, 2006, Doppes asserted Bentley had not complied with the court orders dated June 6, 2006, allowing his attorneys access to the Bentley e-mail system and the ability to "data-mine" the system and had not produced customer service history reports (called "BCMS" reports). Bentley's counsel stated, "I don't know of a court order that says we were to produce BCMS documents," but "the information in the BCMS documents

that has to do with claims handling, customer complaints, complaints of odor and the like have been produced, and anything in those BCMS documents are simply a migration of the data from the claims database into this BCMS system." Bentley's counsel later confirmed, "[t]o the extent that any BCMS documents that relate to customers who have complained of odor are in existence, . . . we will produce them by the close of business tomorrow."

The trial court permitted Doppes to call Brower as a witness to testify. Brower testified that Bentley did not permit him to "data-mine" its e-mails as ordered; rather, Bentley re-sorted the e-mails and stored them on a separate hard drive for him to review. Brower testified he had been permitted to see e-mails in the "sent" folder only for the 60 days previous to the date of the e-mail review (with one exception). Doppes again asked the trial court for an order compelling such access to all e-mails.

In the middle of trial, Brower and Doppes flew to Michigan to review e-mails for two days. Brower found two e-mails with attachments which Bentley had not produced, and which Doppes contended were responsive to his document requests. One record mentioned an odor problem for a model year 2001 Arnage, and another included a spreadsheet titled "Service History Report" providing detailed information on all service performed, including " 'odor reduction' efforts." Bentley had a service history report on every vehicle whose owner had complained of odor. While in Michigan, Brower deposed Bentley executive Joseph Nicosia.

## L.   *Doppes's Midtrial Request for Sanctions*

Based on Brower's review of the e-mails and the Nicosia deposition, Doppes again requested the trial court impose sanctions against Bentley for noncompliance with discovery orders. Doppes requested the court to do one of three things: (1) instruct the jury immediately according to the discovery referee's August 23, 2006 report and recommendation, with additional instructions on Bentley's conduct and the inferences the jury could draw from that conduct; (2) declare a mistrial, award Doppes his attorney fees and costs, and refer the matter back to the discovery referee; or (3) issue terminating sanctions as previously requested.

In requesting these sanctions, Doppes contended the e-mail review and Nicosia deposition revealed that Bentley had withheld documents and had withheld or destroyed e-mails in these respects:

*Deletion of E-mails.* Nicosia testified he used best efforts to implement Bentley's policy not to delete e-mails relating to the odor problem, but conceded there was a possibility e-mail records of service contacts had been

deleted. Nicosia first testified he could not recall whether Bentley had implemented a policy instructing employees not to delete e-mails, but then testified he recalled seeing an e-mail implementing such a policy "[t]hree to four months ago" and believed he used best efforts not to delete e-mails. Nicosia testified there was a possibility he had deleted e-mails with information regarding the odor problem if "the e-mail itself didn't relate to odor." In arguing against additional sanctions, Bentley's counsel responded: "There was not a single question that was asked in [Nicosia's] deposition as to whether or not he retained any e-mails consistent with litigation hold, nor has plaintiff cited to that at all."

*Personal Storage Table (.pst) Files.* Bentley employees were instructed to move their e-mails " 'to your personal folder file (.pst).' " Bentley did not, however, make any such .pst files available to Brower during his e-mail inspection. Bentley's counsel, in arguing against Doppes's request for additional sanctions, stated: "[I]t's not Bentley's job to provide Mr. Brower with instructions on how to do the data mining. It was his own responsibility to do so. We provided a trained, certified, degreed information technical specialist who was there to type in commands that Mr. Brower gave, and if he didn't find the documents, then that's not an issue that can be foisted upon Bentley as being responsible for."

*Customer Complaint Files.* Nicosia testified during his deposition that Bentley maintained " 'multiple file cabinets' " with files on customer complaints. He reviewed the Doppes file on the morning of his deposition and described it as consisting of " 'multiple folders' " that were " '[m]aybe a foot' " thick. According to Nicosia, none of these customer files, which dated back to the late 1990's, had ever been discarded. The files included e-mails with the dealers, written reports from after-sales managers (such as Ham), notes about resolutions, and goodwill payments, including some for odor complaints. Nicosia testified that, in searching for customer service history reports, he reviewed every customer service file for each of the 30 to 40 odor-complaint customers identified by counsel for Bentley. Doppes contended none of those files was ever produced to him before Nicosia's deposition, and Bentley had produced only a redacted version of the Doppes file. Bentley's counsel, in arguing against Doppes's request for additional sanctions, stated: "We produced, earlier in this litigation, customer claims files of all litigation and arbitration cases related to odor. That was something that was a directive of the discovery referee, and we produced every single document that was in those files, but for attorney-client privileged documents, and for those, we produced a privilege log."

*Customer Service History Reports.* In the course of reviewing the Bentley e-mail system, Brower found a sample of a customer service history report.

Doppes claimed Bentley produced none of these customer service history reports for any vehicle, including his own. Nicosia testified he located two such customer service history reports, but never contacted the Bentley customer service center in Tucson, Arizona, where the reports are kept. Bentley's counsel asserted, "Bentley has produced the service history reports on all of the vehicles." Doppes's counsel stated in response: "Out of multiple customers, . . . there's only been two service history reports produced."

*"Names" Computer System.* One of Bentley's computer systems is called the "Names" system, which, according to Nicosia, "is used to capture all sorts of customer concern information." Doppes argued Bentley never produced any Names files in this format, and had produced only a very limited number in a different format. Before using Names, Bentley used a Microsoft Access database called "Tread" for customer complaint information. Bentley did not produce the Tread database or refer to it in discovery responses. Bentley's counsel, in arguing against Doppes's request for additional sanctions, stated: "We did produce Names documents twice. The first was from the version 1 of the Names database. The second was from version 2.0 of the Names database. This is version 2.1, which Bentley has now just implemented. There is no continuing duty to produce documents. We produced the documents when we were requested or ordered or had a referee directive to produce them, and that's when they got them."

*Quality Circle Documents and Records of Goodwill Payments.* Nicosia testified that neither he nor anyone at Bentley ever attempted to locate quality circle documents relating to odor complaints. Nicosia testified Bentley regularly tracked payments to customers or dealers as "goodwill," and, in the customer complaint files he had reviewed on the morning of his deposition, he had found goodwill forms. Bentley had not produced those forms. In arguing against additional sanctions, Bentley's counsel stated, "[t]here was no questioning as to when these quality circle meetings began, and, indeed, we searched for documents on quality circle, and there were no documents relative to the odor issue that we were able to locate." As for the goodwill forms, Bentley's counsel stated: "[T]hat is going to be one of the documents that's going to be produced, Your Honor, tomorrow, and I believe that when Your Honor sees that document, Your Honor will see that it has absolutely no relevance to any type of buy-back or goodwill on an odor complaint."

### M. *The Trial Court's Ruling on the Midtrial Request for Sanctions and Special Instruction*

The trial court denied the request for additional sanctions, deciding instead to read to the jury midtrial the instruction proposed by the discovery referee. The next morning, the trial court read the instruction proposed by the

discovery referee, prefacing it by stating: "[A]s you can see, this case has been extremely hard-fought. There is a lot, a lot at stake, and the attorneys have done a very good job, both sides, aggressively, and I really mean aggressively, representing the interests of their clients. [¶] As a result of being very aggressive, the court has concluded maybe it would be a good idea at this time to give a jury instruction that I want you to pay attention to. [¶] I did not give it earlier, as I told counsel, because I did not want to, quote, poison the well, unquote, but in light of the way things are proceeding, I think it will be helpful to you if I give you this jury instruction at this time."

On October 4, 2006, Doppes requested additional sanctions on the ground Bentley failed to produce its customer complaint files. In opposition, Bentley's counsel argued the customer complaint file for Doppes was a "litigation file" consisting mainly of correspondence between Bentley and its counsel. After hearing argument, the trial court denied the request for additional sanctions but stated it would consider a special jury instruction based on the customer complaint files.

When instructing the jury on October 6, 2006, the trial court read this special instruction: "I have previously instructed you that I have determined that Bentley failed to comply with several Orders of the Court which required Bentley to provide documentary evidence to the Plaintiff. Specifically one such Order required that Bentley produce, no later than June, 'All other documents of any description referring or relating to the odor problems or complaints of odors in Bentley automobiles for model years 1999 to 2006.' You are hereby instructed that the term 'documents' includes e-mail and other electronic records. [¶] [A] Bentley employee testified that Bentley has 30–40 files on customers who complained about odors, at least one of which is over 1 [inch] thick, and even though this court issued an Order which required the production of those files to plaintiff, Bentley has failed to produce those files, except for the file on plaintiff. And even what they produced on plaintiff did not match what the employee testified is normally kept in those files. [¶] The jury can decide for itself how relevant & probative is this information in assisting you to resolve issues in dispute."

### N. *The Jury Verdict*

The jury found that Bentley violated the Song-Beverly Consumer Warranty Act and concealed a material fact, but that neither the violation nor the concealment was intentional, and found that Bentley breached express and implied warranties. The jury awarded Doppes $214,300 as reimbursement for a new vehicle and $100,000 for breach of express and implied warranties.

The judgment, entered in March 2007, awarded Doppes $214,300 as reimbursement concurrent with return of the Bentley automobile (to avoid

double recovery, the judgment did not include an award for breach of express and implied warranties) and prejudgment interest at a 7 percent annual rate. Doppes's appeal from that judgment is case No. G038734.

### O. *Doppes's Motions for Attorney Fees*

In June 2007, Doppes moved to recover $586,844.63 in attorney fees under Civil Code section 1794, subdivision (d) (part of the Song-Beverly Consumer Warranty Act). Bentley filed opposition. The matter was heard in July 2007 and taken under submission.

In August 2007, the trial court issued a six-page order awarding Doppes $344,600. The order stated, "[t]he court's legal attorney performed an exhaustive analysis and the attached spread sheet is the summary of that analysis," then explained in detail the bases for the reduction in fees. The court denied all paralegal time billed; disallowed $53,213 as time spent on claims against NAC and the unsuccessful claims; reduced the allowable billing rate of the lead trial attorney from $400 per hour to $300 per hour; allowed recovery for only one attorney at trial; disallowed all time billed for sanctions motions before the discovery referee; and reduced the amount billed by Brower's office by $43,913 "representing 25% reduction for general excessive time billing for items."

Doppes filed a request to modify the attorney fees award by correcting arithmetical errors. The trial court denied the request, stating it "spent countless hours examining the file and the bills," and concluded the total attorney fees award was "a reasonable fee under all the circumstances." Doppes's appeal from the order regarding attorney fees and the order denying the request to modify the award is case No. G039274.

In October 2007, Doppes moved for postjudgment attorney fees of $72,789.80. In its order on the motion, the trial court stated, "[t]he only new recoverable fees were those allegedly incurred to enforce the judgment" and awarded Doppes $4,427. Doppes's appeal from that order is case No. G039624.

### III.

#### MOTION TO DISMISS APPEAL OR STRIKE PORTIONS OF APPELLANT'S OPENING BRIEF

Bentley has filed a motion to dismiss Doppes's appeal or to strike portions of the appellant's opening brief for noncompliance with the California Rules of Court. The motion is based on three grounds: (1) the appellant's appendix

includes documents that were not before the trial court; (2) the appellant's appendix fails to comply with several formatting rules; and (3) the appellant's opening brief fails to include a record citation for every assertion of fact.

■ On the first point, Bentley argues Doppes's August 4, 2006 motion for terminating sanctions and supporting exhibits (included in the appellant's appendix as tabs 3, 4, 5 & 6) were never before the trial court. Generally speaking, the appendix must contain only documents that were filed or lodged with the superior court. (Cal. Rules of Court, rules 8.122(b)(3), 8.124(b)(1), (2).) California Rules of Court, rule 8.124(g) states: "Filing an appendix constitutes a representation that the appendix consists of accurate copies of documents in the superior court file. The reviewing court may impose monetary or other sanctions for filing an appendix that contains inaccurate copies or otherwise violates this rule."

The documents under tabs 3 through 6 of the appellant's appendix do not bear file stamps indicating they were filed or lodged in the superior court, and the superior court docket does not list them. But conformed copies are not required for documents included in an appendix. (Advisory Com. com., Cal. Rules of Court, rule 8.124(d).)

In opposition to Bentley's motion to dismiss the appeal, Doppes presented evidence establishing the motion for terminating sanctions and the supporting exhibits were presented to the trial court and served on Bentley's counsel on August 28, 2006. Brower stated in a declaration he was present at trial on that date "specifically for the purpose of ensuring that Mr. [Jeffrey] Benice, as lead counsel, filed Doppes' Objection to the Referee's Report, which included two *very* large volumes of Exhibits, the same Exhibits which had been presented to the Referee in support of our request to the referee for discovery sanctions." Brower continues: "The original and copies of the Objection, with copies of the Exhibits, were sitting next to me in a cardboard box. During the first hour that we were present I recall that Mr. Benice delivered the 'original' to the Clerk and I made sure that copies were provided to counsel for Bentley and counsel for Newport Auto."

Doppes's lead trial counsel, Jeffrey S. Benice, stated in a declaration: "I was present in court in this matter on August 28, 2006. I specifically recall that my co-counsel, Joseph M. Preis, filed the two-volume set of exhibits with the court clerk that day. This was the same two-volume set of exhibits that had accompanied my client's motion for terminating sanctions before the discovery referee." Preis submitted a separate declaration stating: "While I have no specific recollection of whether or not it was myself or co-counsel Jeff Benice who filed and served Doppes' objections to the report of the discovery referee and the two binders worth of exhibits, I do specifically

recall seeing a set of the two binders worth of exhibits in front of Jonathan [*sic*] Kaplan and Judge Monroe, on their respective desks."

The reporter's transcript for August 28, 2006, also shows the trial court had received the two-volume set of exhibits. In addressing Doppes's objections to the discovery referee's report and recommendation, the court stated: "We have just begun to deal with 'Plaintiff's Objection to the Report of the Discovery Referee,' dated August 23, 2006, and counsel just pointed out that Mr. Benice has just served on them and also just filed with the court two volumes that would make the Talmud look like it was a comic book."

This evidence, which Bentley does not contradict, establishes the August 2006 motion for terminating sanctions and the supporting exhibits were before the trial court and are properly part of the appellant's appendix. It would be preferable for Doppes's counsel to have obtained conformed copies of those documents, but considering the busy nature of trial, failure to do so was excusable.

Bentley also contends the appellant's appendix fails to comply with several formatting rules, specifically (1) the appendix does not have an alphabetical index (Cal. Rules of Court, rule 8.144(b)(1)); (2) the covers do not state the names and addresses of Bentley's appellate counsel (*id.*, rule 8.144(c)(2)); (3) the covers lack inclusive page numbers for each volume (*ibid.*); (4) the cover of the service copy of the appendix is not the same color as that of the corresponding brief (*id.*, rule 8.40(b)); and (5) the appendix has inserter tabs. The last objection—to the use of inserter tabs—has no merit because the pages of the appellant's appendix are also consecutively numbered. (See *Wells Fargo Bank v. California Ins. Guarantee Assn.* (1995) 38 Cal.App.4th 936, 939, fn. 1 [45 Cal.Rptr.2d 537] [criticizing use of inserter tabs *instead* of consecutive pagination].) We encourage the use of inserter tabs in appendices to supplement consecutive pagination because they make it easier to find particular documents.

Doppes does not deny the first four objections but asserts they are "trivial transgressions." While the infractions are not trivial, we conclude they do not warrant sanctions because none caused prejudice, confusion, or additional work for the court clerk's office.

Bentley asserts the appellant's appendix does not include the exhibits submitted with Doppes's September 26, 2006 request for further relief. Bentley had the option of including those exhibits in the respondent's appendix if it wanted them in the record. (Cal. Rules of Court, rule 8.124(a)(3).)

Finally, Bentley contends portions of the appellant's opening brief are not supported by citations to the record and therefore should be stricken.

California Rules of Court, rule 8.204(a)(1)(C) requires every reference to a matter in the appellate record be supported with a citation to the volume and page number of the record where the matter appears. The rule applies wherever a reference to a matter in the record appears in a brief. (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16 [126 Cal.Rptr.2d 178].)

We have reviewed the list of passages that Bentley requests be stricken from the appellant's opening brief. In most cases, Bentley objects that the brief "cites to matters not properly in the record on appeal," that is, the brief cites to the exhibits to the August 2006 motion for terminating sanctions. Because, we conclude, those exhibits are properly part of the record, the objections are not well taken.

Some of Bentley's objections are valid. Sections of the statement of facts in the appellant's opening brief include no record citations at all. While Doppes should have provided more record citations, we do not find the violations of California Rules of Court, rule 8.204(a)(1)(C) to be substantial enough to justify striking the appellant's opening brief or dismissing the appeal. We will, however, decline to consider certain parts of the appellant's opening brief, as noted in the margin.[4]

Bentley's motion to dismiss the appeal or strike portions of the appellant's opening brief requests monetary sanctions against Doppes, and Doppes's opposition to the motion requests monetary sanctions against Bentley. Neither the motion nor the opposition was frivolous. Both requests for sanctions are denied.

---

[4] 1. On page 4, the last two sentences of the first full paragraph beginning "Ham also instructed."

2. On page 6, the last sentence of the second full paragraph beginning "On November 22, 2005."

3. On page 7, the third paragraph beginning "However, once again."

4. On page 8, the first full paragraph beginning "The importance of Mr. Cartman" and the second paragraph, beginning "Bentley did not produce," that continues to page 9.

5. On page 10, the fourth full paragraph beginning "When Bentley finally responded" that continues to page 11.

6. On page 19, the last sentence of the third paragraph beginning "The customer files date back."

7. On page 20, the last sentence of the second paragraph beginning "One of Bentley's computer systems."

8. On page 21, the last sentence of the first full paragraph beginning "Doppes continually sought."

# IV.

## TERMINATING SANCTIONS FOR MISUSE OF DISCOVERY

### A.  *Legal Principles*

Imposition of sanctions for misuse of discovery lies within the trial court's discretion, and is reviewed only for abuse. Doppes argues this is the rare occasion when the trial court abused its discretion by not imposing a terminating sanction—the ultimate sanction for discovery abuse—for Bentley's conduct. We agree.

■  California discovery law authorizes a range of penalties for conduct amounting to "misuse of the discovery process." (Code Civ. Proc., § 2023.030; *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 12 [74 Cal.Rptr.2d 248, 954 P.2d 511].) As relevant here, misuses of the discovery process include "[f]ailing to respond or to submit to an authorized method of discovery" (Code Civ. Proc., § 2023.010, subd. (d)); "[m]aking, without substantial justification, an unmeritorious objection to discovery" (*id.*, § 2023.010, subd. (e)); "[m]aking an evasive response to discovery" (*id.*, § 2023.010, subd. (f)); and "[d]isobeying a court order to provide discovery" (*id.*, § 2023.010, subd. (g)).

Code of Civil Procedure section 2025.450, subdivision (d) authorizes a trial court to impose an issue, evidence, or terminating sanction under Code of Civil Procedure section 2023.030 if a party or party-affiliated deponent "fails to obey an order compelling attendance, testimony, and production." Section 2023.030 authorizes a trial court to impose monetary sanctions, issue sanctions, evidence sanctions, or terminating sanctions against "anyone engaging in conduct that is a misuse of the discovery process."

As to issue sanctions, subdivision (b) of Code of Civil Procedure section 2023.030 provides: "The court may impose an issue sanction ordering that designated facts shall be taken as established in the action in accordance with the claim of the party adversely affected by the misuse of the discovery process. The court may also impose an issue sanction by an order prohibiting any party engaging in the misuse of the discovery process from supporting or opposing designated claims or defenses."

As to evidence sanctions, subdivision (c) of Code of Civil Procedure section 2023.030 provides: "The court may impose an evidence sanction by an order prohibiting any party engaging in the misuse of the discovery process from introducing designated matters in evidence."

As to terminating sanctions, Code of Civil Procedure section 2023.030, subdivision (d) provides: "The court may impose a terminating sanction by one of the following orders: [¶] (1) An order striking out the pleadings or parts of the pleadings of any party engaging in the misuse of the discovery process. [¶] (2) An order staying further proceedings by that party until an order for discovery is obeyed. [¶] (3) An order dismissing the action, or any part of the action, of that party. [¶] (4) An order rendering a judgment by default against that party."

■ The trial court has broad discretion in selecting discovery sanctions, subject to reversal only for abuse. (*Reedy v. Bussell* (2007) 148 Cal.App.4th 1272, 1293 [56 Cal.Rptr.3d 216] (*Reedy*); *Miranda v. 21st Century Ins. Co.* (2004) 117 Cal.App.4th 913, 928–929 [12 Cal.Rptr.3d 159].) The trial court should consider both the conduct being sanctioned and its effect on the party seeking discovery and, in choosing a sanction, should " 'attempt[] to tailor the sanction to the harm caused by the withheld discovery.' " (*Do It Urself Moving & Storage, Inc. v. Brown, Leifer, Slatkin & Berns* (1992) 7 Cal.App.4th 27, 36 [9 Cal.Rptr.2d 396].) The trial court cannot impose sanctions for misuse of the discovery process as a punishment. (*Laguna Auto Body v. Farmers Ins. Exchange* (1991) 231 Cal.App.3d 481, 488 [282 Cal.Rptr. 530], disapproved on another ground in *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 478, fn. 4 [66 Cal.Rptr.2d 319, 940 P.2d 906].)

The discovery statutes evince an incremental approach to discovery sanctions, starting with monetary sanctions and ending with the ultimate sanction of termination. "Discovery sanctions 'should be appropriate to the dereliction, and should not exceed that which is required to protect the interests of the party entitled to but denied discovery.' " (*Laguna Auto Body v. Farmers Ins. Exchange, supra*, 231 Cal.App.3d at p. 487.) If a lesser sanction fails to curb misuse, a greater sanction is warranted: continuing misuses of the discovery process warrant incrementally harsher sanctions until the sanction is reached that will curb the abuse. "A decision to order terminating sanctions should not be made lightly. But where a violation is willful, preceded by a history of abuse, and the evidence shows that less severe sanctions would not produce compliance with the discovery rules, the trial court is justified in imposing the ultimate sanction."[5] (*Mileikowsky v. Tenet Healthsystem* (2005) 128 Cal.App.4th 262, 279–280 [26 Cal.Rptr.3d 831].)

---

[5] The court in *New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1408 [86 Cal.Rptr.3d 457] concluded a trial court has no statutory authority to impose evidence or issue sanctions absent a failure to obey an order compelling discovery. We need not reach that issue because Bentley failed to obey several orders and directives compelling discovery.

## B.   *The Trial Court Erred by Failing to Impose Terminating Sanctions Against Bentley at Trial*

The discovery referee's reports and recommendations, both approved by the trial court, found that Bentley engaged in persistent and serious misuse of the discovery process. The discovery referee stated in the June 5, 2006 report and recommendation, "[t]he record establishes that defendant Bentley failed to timely produce relevant and properly demanded, but potentially damaging, documents." In the August 23, 2006 report and recommendation, the discovery referee found "Bentley has not adequately explained its failure to provide full and complete evidence," "Bentley's discovery responses have not been complete and leave much in doubt," "[a]lthough Bentley has been repeatedly ordered to provide full and complete discovery, Bentley has steadfastly failed to do so," and "the history of Bentley's discovery obstruction can be found in Plaintiff's motions." The discovery referee concluded: "The record leaves good reason to believe that Bentley is either withholding documents, or has failed to conduct a diligent search to find them." The trial court approved both reports and recommendations.

Bentley does not challenge the discovery referee's findings. Bentley does not deny it misused the discovery process. Bentley argues only that the trial court did not abuse its discretion in declining to impose terminating sanctions.

By the time trial started, Bentley had violated four discovery orders or directives: (1) the July 20, 2005 order compelling Bentley to produce documents by August 9, 2005; (2) the December 15, 2005 order; (3) the discovery referee's January 31, 2006 directive; and (4) the June 6, 2006 order. It is also clear that Ham lied during the Better Business Bureau hearing and was not forthcoming in his deposition. The discovery referee found Bentley had stonewalled in producing highly relevant documents and Doppes had suffered severe prejudice as a result. In the June 5, 2006 report and recommendation, the discovery referee had given Bentley a chance to " 'cure' " the problems it had created. Bentley failed to do so.

Monetary sanctions had not deterred Bentley from misusing the discovery process. Severe issue and/or evidence sanctions would have been warranted by the time of the discovery referee's June 5, 2006 report and recommendation, and terminating sanctions would have been warranted by the time of the discovery referee's August 23, 2006 report and recommendation. We cannot say, however, the trial court abused its discretion initially in approving the discovery referee's recommendation in the August 2006 report of imposing the "more narrow" sanction of giving the jury instruction.

But Doppes's request for additional sanctions during trial revealed Bentley's conduct was worse than originally known. Despite monetary and issue sanctions, Bentley had flagrantly engaged in such further discovery abuses so as to compel the trial court to impose the next level of sanctions—terminating sanctions.

The evidence presented in support of the request for additional sanctions, though disputed in some ways by Bentley, did show serious, continuing discovery abuses. Bentley was not forthcoming with the .pst files. Nicosia testified he did not receive an e-mail instructing him not to delete e-mails regarding the odor problem until only three or four months before his deposition in September 2006. Nicosia testified that Bentley had 30 to 40 files for customers who had complained about odor, but had produced none except for a redacted version of the Doppes file. As a result of these dramatic revelations, the trial court explained Bentley's failures and instructed the jury that the court had issued an order requiring production of those files, and Bentley had failed to do so, except for the modified Doppes file.

■ At that point, once it was learned *during trial* that Bentley still had failed miserably to comply with discovery orders and directives, we hold the trial court had to impose terminating sanctions. Each degree of sanctions had failed. The trial court and discovery referee had been remarkably moderate in dealing with Bentley, ultimately imposing only a form of issue sanction after repeated violations of discovery orders that would have justified terminating sanctions. Yet, during the middle of trial, it was learned that Bentley still had not complied with discovery orders and directives, had been irresponsible at best in preventing destruction of e-mails, had not fully permitted data mining of e-mails as previously ordered, and had failed to produce documents it should have produced months earlier. Bentley's discovery abuses were "willful, preceded by a history of abuse, and the evidence shows that less severe sanctions would not produce compliance with the discovery rules." (*Mileikowsky v. Tenet Healthsystem, supra*, 128 Cal.App.4th at pp. 279–280.) Terminating sanctions against Bentley were imperative.

## C.  Case Authority

Doppes relies on two cases as supporting imposition of terminating sanctions against Bentley: *Reedy, supra*, 148 Cal.App.4th 1272, and *Liberty Mutual Fire Ins. Co. v. LcL Administrators, Inc.* (2008) 163 Cal.App.4th 1093 [78 Cal.Rptr.3d 200] (*Liberty Mutual*).

In *Reedy*, the trial court imposed terminating sanctions against the defendants on three probate petitions and default judgments on two petitions based on the following conduct: "In February of 2004, the court ordered [defendant]

Letantia to turn over all the records and documents which her late husband, John, had generated or maintained in the course of his tenure as trustee of the trusts at issue in this case. She did not. And when [the plaintiff] made a motion for sanctions based upon that failure, [the defendant] actually argued she had a fiduciary duty to keep the documents—despite the court's express directive—until the conclusion of the litigation. In September of 2004, the court ordered both [defendants] to answer discovery without objections. They didn't. In fact, they offered no responses at all—on the specious basis that the court had imposed no specific deadline for their answers—until [the plaintiff] was forced to make an ex parte application to the court to impose one. Even then, the responses she finally got were saturated with objections. In September of 2004, [defendant] Letantia was also ordered to appear for a second day of her deposition, which she never did. As these examples demonstrate, we are faced with abundant evidence of both willful misconduct and violations of court orders. Since there is no basis upon which anyone could conclude they were unaware of those orders and no other explanation suggest[s] itself, we must construe their violations as willful. [¶] . . . [¶] . . . In our view, the court bent over so far backward in its effort to ensure this case would proceed on the merits—to give [the defendants] every benefit of the doubt, and every opportunity to ultimately comply with their obligations—that they began to believe their conduct was somehow acceptable. So they just kept pushing. [¶] Their final effort; i.e., the attempt to schedule *11* depositions in the week prior to recommencement of the trial in this case, coupled with the flatly and literally incredible assertion the discovery was suddenly being sought in connection with *other petitions not yet scheduled for trial*, was understandably the last straw. In the face of such an effort, the court could neither continue giving [the defendants] the benefit of the doubt, nor could it reasonably assume that some lesser sanction (such as additional monetary penalties) would be sufficient to curb their continued abuses." (*Reedy, supra*, 148 Cal.App.4th at pp. 1291–1292, fn. omitted.)

A panel of this court found no abuse of discretion in the trial court's decision to impose terminating sanctions on the three petitions because "[t]he record here demonstrates the [defendants] were recalcitrant in virtually every aspect of discovery, and failed to either produce documents or provide proper written answers to discovery. . . . Their obstinacy continued during trial." (*Reedy, supra*, 148 Cal.App.4th at p. 1293.) With respect to the two default judgments, the panel reversed and remanded with directions for the trial court to consider more limited issue sanctions related to liability. (*Id.* at p. 1295.)

In *Liberty Mutual, supra*, 163 Cal.App.4th at pages 1096, 1099, the plaintiff propounded three sets of interrogatories, asking for witnesses, documents, and facts supporting the defendant's affirmative defenses and allegations of the cross-complaint. The defendant provided inadequate or evasive answers, and the trial court granted the plaintiff's motions to compel further

responses. (*Id.* at p. 1096.) The defendant's supplemental responses were inadequate. (*Id.* at p. 1097.) The trial court gave the defendant another opportunity to provide adequate responses, imposed monetary sanctions against the defendant, but denied the plaintiff's request for issue sanctions. (*Ibid.*) The defendant failed to provide adequate answers and ignored the plaintiff's request to meet and confer. (*Id.* at p. 1099.) The trial court granted the plaintiff's motion for terminating sanctions, ruling the defendant "had abused the discovery process by repeatedly providing evasive and incomplete responses and by ignoring [the plaintiff]'s meet and confer letter requesting a third supplemental response." (*Ibid.*) The trial court struck the answer and cross-complaint, noting the defendant "not only repeatedly gave deficient responses but also failed to meet and confer," and the defendant's conduct "constituted 'a flagrant abuse of the discovery process.' " (*Id.* at p. 1101.)

The Court of Appeal affirmed, concluding, "[g]iven [the defendant]'s months-long lack of cooperation in providing straightforward information, witnesses, and documents to support its claims of malfeasance, the trial court could reasonably conclude that the ultimate sanction was appropriate." (*Liberty Mutual, supra*, 163 Cal.App.4th at p. 1106.)

Doppes argues Bentley's history of discovery abuse was worse than the conduct that was the object of terminating sanctions in *Reedy* and *Liberty Mutual*. However, in *Reedy* and *Liberty Mutual*, the appellate courts affirmed the trial court's decision to impose terminating sanctions; the cases describe circumstances justifying terminating sanctions, but not necessarily requiring them. Highly relevant would be cases in which the appellate court reversed an order denying terminating sanctions. The parties here have not cited such a case, and our research has disclosed none.

The lack of analogous case authority does not mean reversing the denial of terminating sanctions is unwarranted—only that it might be unprecedented in published opinions. In this case, the trial court had to impose terminating sanctions once it was learned during trial that Bentley still had failed to comply with discovery orders and directives and Bentley's misuse of the discovery process was even worse than previously known.

Accordingly, we affirm the judgment on the Song-Beverly Consumer Warranty Act cause of action and the breach of warranty causes of action in Doppes's favor, and direct the trial court to make an express finding that Bentley intentionally violated the Song-Beverly Consumer Warranty Act. We reverse the judgment on the fraud cause of action, with directions to the trial court to strike Bentley's answer, enter a default and default judgment against Bentley on that cause of action, and to conduct further proceedings consistent with *Greenup v. Rodman* (1986) 42 Cal.3d 822, 826–829 [231 Cal.Rptr. 220,

726 P.2d 1295]. Any fraud damages and statutory penalties must be established by a prove-up hearing.

## V.

### ATTORNEY FEES

Doppes brought two motions for attorney fees, one after trial and before entry of judgment (the posttrial motion) and the other after entry of judgment (the postjudgment motion). He argues the trial court erred by failing to award him all the attorney fees he requested in the motions.

### A. *Legal Principles*

A prevailing buyer in a lawsuit under the Song-Beverly Consumer Warranty Act is entitled to recover reasonable attorney fees: "If the buyer prevails in an action under this section, the buyer shall be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees based on actual time expended, determined by the court to have been reasonably incurred by the buyer in connection with the commencement and prosecution of such action." (Civ. Code, § 1794, subd. (d).) "By permitting prevailing buyers to recover their attorney fees in addition to costs and expenses, our Legislature has provided injured consumers strong encouragement to seek legal redress in a situation in which a lawsuit might not otherwise have been economically feasible." (*Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 994 [73 Cal.Rptr.2d 682, 953 P.2d 858].)

█ Civil Code section 1794, subdivision (d) requires the attorney fees to be based on "actual time expended" and to have been "reasonably incurred." In *Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 818–819, 820 [50 Cal.Rptr.3d 731] (*Robertson*), the court concluded, "the statutory language of section 1794, subdivision (d), is reasonably compatible with a lodestar adjustment method of calculating attorney fees" because "the lodestar adjustment method *is* based on actual, reasonable attorney time expended as the objective starting point of the analysis [citation], it is compatible with this statutory provision." The lodestar method is applicable to calculating attorney fees under section 1794, subdivision (d), the court reasoned, because "the lodestar adjustment method is the prevailing rule for calculation of statutory attorney fees unless the statute expressly indicates a contrary intent, and no such contrary intent is apparent . . . ." (*Robertson, supra,* 144 Cal.App.4th at p. 821.) We agree.

■ The lodestar adjustment method requires the trial court first to determine a touchstone or lodestar figure based on actual time spent and reasonable hourly compensation for each attorney. (*Robertson, supra*, 144 Cal.App.4th at p. 819, citing *Serrano v. Priest* (1977) 20 Cal.3d 25, 48–49 [141 Cal.Rptr. 315, 569 P.2d 1303].) "The touchstone figure may then be augmented or diminished by taking various relevant factors into account, including (1) the novelty and difficulty of the questions involved and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; and (3) the contingent nature of the fee award, based on the uncertainty of prevailing on the merits and of establishing eligibility for the award." (*Robertson, supra*, 144 Cal.App.4th at p. 819.) For Song-Beverly Consumer Warranty Act claims, "[a] prevailing buyer has the burden of 'showing that the fees incurred were "allowable," were "reasonably necessary to the conduct of the litigation," and were "reasonable in amount." ' " (*Nightingale v. Hyundai Motor America* (1994) 31 Cal.App.4th 99, 104 [37 Cal.Rptr.2d 149].)

We review an award of attorney fees under Civil Code section 1794, subdivision (d) for abuse of discretion. (*Robertson, supra*, 144 Cal.App.4th at p. 817; *Levy v. Toyota Motor Sales, U.S.A., Inc.* (1992) 4 Cal.App.4th 807, 816 [5 Cal.Rptr.2d 770].) We presume the trial court's attorney fees award is correct, and "[w]hen the trial court substantially reduces a fee or cost request, we infer the court has determined the request was inflated." (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1322, 1323 [81 Cal.Rptr.3d 866].) "The ' "experienced trial judge is the best judge of the value of professional services rendered in his [or her] court, and while his [or her] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." ' " (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 [104 Cal.Rptr.2d 377, 17 P.3d 735].)

### B.  *The Posttrial Motion and Order Awarding Attorney Fees*

In calculating the amount of the attorney fees award, the trial court in effect set a lodestar figure for each of the two law firms representing Doppes, and then reduced their amount of fees for various reasons.

### 1.  *Benice Law Firm.*

Doppes sought recovery of $290,253 in fees billed by the law firm of his lead trial counsel, Jeffrey Benice. From that amount, the trial court subtracted $10,294 in costs and $12,886 in paralegal fees to reach a lodestar figure of

$267,073.[6] (Doppes does not address the deductions for costs and paralegal fees.) The trial court then reduced the lodestar figure by roughly 20 percent for "non recoverable Newport claims, fraud claims and unsuccessful malice claims," to reach a figure of $212,859 for Benice's law firm.

*Reducing Benice's Hourly Rate from $400 to $300.* Doppes contends the trial court abused its discretion by reducing Benice's hourly billing rate from $400 to $300. While the order states the hourly rate is being reduced, the calculation of the amount of recoverable attorney fees does not reflect the reduction. The trial court deducted costs and paralegal fees from the amount sought, then reduced that amount by 20 percent for the nonrecoverable claims. No additional reduction was made for a reduced billing rate.

*Reduction for Claims Against NAC and for Fraud Claim.* The trial court did not abuse its discretion in reducing the amount for the claims against NAC because NAC prevailed. As to attorney fees on the fraud cause of action, we will direct entry of a default judgment against Bentley on the fraud cause of action. We do not opine whether Doppes can recover attorney fees on the fraud cause of action as that issue was not raised on appeal.

2. *Brower Law Firm.*

The trial court set a lodestar figure of $322,916 for the amount billed by Brower's law firm. From the lodestar figure, the court made reductions to reach an award of $131,741. Of those reductions, Doppes challenges the following:

*Disallowing Time for Second Chair Attorney at Trial.* The trial court disallowed $34,187 in trial time for Brower's law firm "as unnecessary, only one experienced trial attorney necessary and Mr. Benice did all the questioning and arguing at the trial." Having a second chair at trial is not unusual and often necessary. However, the trial court was " ' "the best judge of the value of professional services rendered in [the trial] court" ' " (*Ketchum v. Moses, supra,* 24 Cal.4th at p. 1132), and was in the better position to determine whether a second chair for one of two law firms representing Doppes at *this* trial was necessary (*Levy v. Toyota Motor Sales, U.S.A., Inc., supra,* 4 Cal.App.4th at p. 816).

*Reducing Award by $43,913 for Excessive Billing.* The trial court disallowed $43,913 "representing 25% reduction for general excessive time billing for items." Doppes argues, "there was no justification for reducing the

---

[6] The trial court's minute order has both $267,073 and $266,073 as total attorney fees claimed. Our calculations lead us to conclude the correct figure is $267,073.

award . . . for 'excessive billing' " because Bentley's conduct "drove up the cost of litigation." But, "[w]here . . . the trial court severely curtails the number of compensable hours in a fee award, we presume the court concluded the fee request was padded." (*Christian Research Institute v. Alnor, supra,* 165 Cal.App.4th at p. 1325.) " '[P]adding' in the form of inefficient or duplicative efforts is not subject to compensation." (*Ketchum v. Moses, supra,* 24 Cal.4th at p. 1132.)

Doppes contends the court, in *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550 [77 Cal.Rptr.3d 695], "rejected a similar argument that a fee request contained 'duplicative' billing." In that case, the appellants challenged an award of attorney fees, contending the trial court erred by not reducing the award for excessive and duplicative billing. (*Id.* at pp. 560–561.) The appellate court affirmed, noting the appellants had submitted no evidence in the trial court to show the fees sought were excessive or to refute declarations explaining there was no duplication of fees. (*Id.* at pp. 560, 562.) The appellate court declined the appellants' invitation to declare "as a matter of law that the hours were unreasonable." (*Id.* at p. 560.) Here, we cannot declare the converse—that Brower's fees were reasonable as a matter of law—and override the trial court's discretion in making a 25 percent reduction in fees.

*Eliminating All Fees for Discovery Motions and Motions for Terminating Sanctions.* The trial court disallowed a total of $61,862 in fees for discovery motions. The court disallowed $4,275 incurred for the November 22, 2005 discovery motion because the court had already awarded Doppes $3,850 when granting that motion. Doppes does not specifically address that disallowance, and we find no abuse of discretion in it.

The trial court disallowed $20,100 in fees for the January 10, 2006 motions resolved by the discovery referee, and disallowed $37,487 for "the referee[']s proceedings, as referee Zebrowski already made [an] award of $15,000 for those costs." Doppes argues the trial court "misread the undisputed evidence" in disallowing those attorney fees because his motion for attorney fees excluded $15,300 of time that had been paid by sanctions. Brower's declaration submitted in support of the motion for attorney fees supports that assertion. The attorney fees award therefore must be increased by $15,300.

Doppes also asserts, "[t]he only award was for the fees and costs in attending the deposition (pursuant to an order of the trial court, not just a suggestion of the discovery referee), and those fees (and costs) were removed from the totals submitted in the fee motion." Doppes argues it was an abuse of discretion to disallow a total of $57,587 in attorney fees on the ground the discovery referee had awarded that amount in sanctions because the discovery

referee did not award sanctions on the discovery proceedings, other than for the cost of the deposition in the United Kingdom. Bentley does not respond to this assertion.

The record shows that, other than the cost of the deposition in the United Kingdom, the discovery referee did not recommend awarding Doppes any attorney fees. The June 5, 2006 report and recommendation did not recommend imposition of money sanctions, and the August 23, 2006 report and recommendation recommended "monetary sanctions be denied." Thus, the trial court's finding the discovery referee already made an award of $15,000 was incorrect. It would be manifestly unjust not to permit Doppes to recover his attorney fees incurred in the discovery motions and proceedings before the discovery referee because Bentley's bad faith conduct in discovery made those fees necessary. The trial court therefore abused its discretion in disallowing a total of $57,587 in attorney fees incurred in connection with the proceedings before the discovery referee.

3. *Conclusion.*

Doppes was entitled to recover $57,587 in attorney fees incurred in connection with proceedings before the discovery referee in addition to the $344,600 in attorney fees awarded by the trial court. In the disposition, we will direct the trial court to enter an order granting Doppes's posttrial motion for attorney fees in the total amount of $402,187.

### C. *The Postjudgment Motion and Order Awarding Attorney Fees*

In October 2007, Doppes moved for postjudgment attorney fees of $72,789.80. The motion requested attorney fees incurred after Doppes filed the posttrial motion for attorney fees, including fees incurred in attending the hearing on that motion.

In an order dated November 6, 2007, the trial court stated: "As to the fees plaintiff incurred on [his] initial fees motion and after the initial filing of the motion, plaintiff should have been prepared to ask for those fees prior to the final ruling on the motion to avoid serial motions on that issue. Also, the fees awarded as a result of that motion were sufficient to cover the reasonable hours and . . . reasonable hourly rate for the entire motion up to the final ruling on the motion. [¶] As to plaintiff['s] fees incurred to litigate N[AC]'s attorney fee motion and N[AC]'s cost bill, Bentley Motors is not responsible for those fees and his motion only sought fees against Bentley Motors. [¶] The only new recoverable fees were those allegedly incurred to enforce the judgment, which w[ere] $552.50. The court also accepts the representation

that an additional $1275 will be incurred to prepare notices of ruling, orders or final judgments. Therefore this award is increased to a total of $1827.00."

The trial court disallowed any fees incurred in preparing the postjudgment motion for attorney fees, but awarded Doppes additional amounts for a total postjudgment award of $4,427.

■ The trial court erred in two respects. First, there is no rule prohibiting a party from bringing a second motion to recover attorney fees incurred since an initial motion was filed. While it might have been more desirable for Doppes to have submitted an additional declaration before the hearing on the initial motion for attorney fees, a second motion including other postjudgment attorney fees was permissible.

■ Second, when attorney fees are recoverable by statute, the reasonable attorney fees incurred in preparing the motion are also recoverable. (*Estate of Trynin* (1989) 49 Cal.3d 868, 875 [264 Cal.Rptr. 93, 782 P.2d 232].) The trial court erred here by declining to award Doppes any attorney fees on the postjudgment motion. We will direct the court on remand to reconsider the postjudgment motion for attorney fees to award Doppes a reasonable amount of fees incurred in bringing that motion.

## VI.

### DISPOSITION

The judgment on the causes of action against Bentley under the Song-Beverly Consumer Warranty Act, for breach of express warranty, and for breach of implied warranty are affirmed. The judgment in favor of Bentley on the fraud cause of action is reversed. The matter is remanded to the trial court with directions to (1) strike Bentley's answer and enter a default and default judgment against Bentley on the fraud cause of action; (2) make an express finding in the judgment that Bentley intentionally violated the Song-Beverly Consumer Warranty Act; (3) enter an order granting the posttrial motion for attorney fees in the total amount of $402,187; (4) reconsider the postjudgment motion for attorney fees in accordance with this opinion; and (5) conduct further proceedings not inconsistent with this

opinion, including a default prove-up on the fraud cause of action, imposition of civil penalties under Civil Code section 1794, and consideration of other relief sought in the complaint. Appellant to recover costs incurred on appeal.

O'Leary, Acting P. J., and Moore, J., concurred.

Respondent's petition for review by the Supreme Court was denied September 23, 2009, S174711. Werdegar, J., did not participate therein.