Filed 7/1/16  Le v. Blue Tax, Inc. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ANNIE LE, | B259507 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC490731) |
| v. | |
| BLUE TAX, INC. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Soussan G. Bruguera, Judge.  Reversed.

Duchrow & Piano, David J. Duchrow, and Jill A. Piano for Plaintiff and Appellant.

Makarem & Associates, Ronald W. Makarem, Jean-Paul Le Clercq, Law Offices of Roshni F. Ghandhi, and Roshni F. Ghandhi for Defendants and Respondents.

_____

Plaintiff and appellant Annie Le sued her former employer, respondent Blue Tax, Inc.,[1] alleging claims for race and disability discrimination and harassment under the Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.),[2] Labor Code wage violations, and related wrongs. The trial court granted Blue Tax's motion for terminating sanctions for discovery abuse.[3] We reverse.

## FACTS

### *Background*

Because Le's appeal arises in a pre-trial context, we state the facts as alleged in her operative pleading. We accept Le's alleged facts as true solely for purposes of addressing her appeal. With this framework in mind, we turn to the facts.

Le is Vietnamese, and has the physical condition "known as Strabismus." Le's complaint describes her condition as "a cosmetic disfigurement in which the two eyes do not line up in the same direction, and therefore do not look at the same object at the same time. The condition is more commonly known as 'crossed eyes.'" In accord with the FEHA's statutory definition of physical disability (see §§ 12926; 12955.3), Le alleges that her condition "impairs [her] life activities including seeing and working."[4]

---

[1] Our references to Blue Tax include respondents David Urbas and Todd Lewis, both of whom are alleged in Le's action to be managing agents of the business. We will refer to Urbas and Lewis individually only as needed for clarity. Le also sued David Guaracha, another alleged Blue Tax manager, but dismissed him from her action shortly after it was filed because, she says, he filed a bankruptcy case. Guaracha is not a party to Le's appeal.

[2] All further undesignated section references are to the Government Code except as otherwise noted.

[3] We construe the trial court's order to be an appealable judgment of dismissal in substance. By a subsequent order on Le's motion to tax costs, the court awarded a total of $5,439.85 in costs in favor of Blue Tax.

[4] In our independent research, we had have found no case affirming a fact-finder's determination that Strabismus is a physical disability as defined within any employment discrimination statutes.

2

In April 2010, Blue Tax hired Le to "handle" tax returns for its clients. "Even though [Le] clocked out after [eight] hours, she worked nine hours or more each work day" without being paid overtime wages. Further, Blue Tax "fail[ed] to provide rest periods for every four . . . hours . . . worked per day and fail[ed] to provide compensation for such unprovided rest periods . . . ."

On July 20, 2011, Le arrived for work at 6:50 a.m. Later in the day, a Blue Tax manager, David Guaracha (see footnote 1, *ante*), "attempted to give [Le] a disciplinary write-up for being late even though her normal scheduled time to come in was at 8:00 a.m." Still later that day, apparently after leaving work, Le "found out" that Guaracha had sent an email to a number of other Blue Tax managers, "making fun of [her] eye disability and broken English," and "attaching a picture of an ugly, cross-eyed dog" to the email. One of the managers had sent an email back to Guaracha stating, "I hate having to listen to Annie talk. All I see now is the dog picture." Another Blue Tax manager, respondent Lewis (see footnote 1, *ante*), responded to Guaracha's email with a comment, "LOL," meaning "laughing out loud." No manager at Blue Tax made any effort to stop the emails or challenge any person for circulating the emails.[5]

The day after Guaracha's offensive email "surfaced," he "went through" Le's personal email folder on her work computer and found an email that she had written to her husband (a co-worker at Blue Tax) venting her frustration that Guaracha would not allow her to take time off from work even though he allowed other employees to do so. Shortly thereafter, Lewis called Le into his office where he handed her a "write-up" for "a misuse of company email" and also for stating to other employees during her lunch break, "this is bullshit, things will never change here." Lewis suspended Le for two days.

---

[5] There is no allegation in Le's FAC as to how she "found out" about or obtained copies of these emails. Blue Tax asserts in its brief that Le "later admitted under oath that she unlawfully accessed her managers' private computers from her home, which is how she became aware of the dog photograph email . . . ." However, the cite to the appellate record for this assertion, clerk's transcript at pages 130-131, shows no such admission. Assuming a "hacking" scenario is true, the issue of computer wrongdoing is not a matter for the discovery sanction issues involved in Le's appeal.

When Le returned to work from her suspension on July 25, 2011, Lewis handed her a final paycheck and terminated her employment.

*Le's Lawsuit*

In August 2012, Le sued Blue Tax. In September 2013, Le filed her operative first amended complaint (FAC) alleging eleven causes of action, listed respectively: employment discrimination in violation of FEHA based on physical disability; employment discrimination under the FEHA based on race; harassment under the FEHA based on physical disability; harassment under the FEHA based on race; failure to prevent discrimination and harassment in violation of the FEHA; retaliation in violation of the FEHA; wrongful termination in violation of the public policies against racial and disability protections embodied in the FEHA and the state and federal constitutions; intentional infliction of emotional distress; failure to pay overtime wages in violation of the Labor Code; failure to provide rest periods in violation of the Labor Code and state labor regulations; and wrongful termination in violation of the public policies set forth in the Labor Code allowing employees to discuss workplace conditions. Le's causes of action were based on the alleged facts summarized above.

*Discovery*

In December 2012, Blue Tax served Le with a notice of deposition, including a demand for production of documents. Pursuant to the notice, Blue Tax's lawyer deposed Le on January 10, 2013. At that time, Le produced approximately 40 pages of documents, and Blue Tax's counsel questioned her on a number of the documents.[6] In addition to the documents produced, Le provide Blue Tax with a written response to the company's request for documents, which included a series of objections, including privilege, and representations that no relevant documents existed as to certain requests.

---

**6** For example, Blue Tax's counsel questioned Le about an "Employee Warning Notice" dated "July 20, 2010" [*sic*] which she produced. Further, counsel questioned Le about another "Employee Warning Notice" dated July 21, 2011, which she produced. Counsel also questioned Le about the Guaracha email, which became a prominent part of her lawsuit.

4

On January 24, 2013, about two weeks after Le's deposition, Blue Tax served her with Judicial Council approved "Form Interrogatories — Employment Law;" along with Requests for Admissions (RFAs), and a Request for Production of Documents. In late February 2013, Blue Tax granted a request from Le's counsel for a two-week extension to respond to this first round of written discovery.

On March 14, 2013, Le served responses to Blue Tax's request for production of documents. In her responses, Le objected generally to producing any document that was "already in the possession of [Blue Tax] on the grounds that any such production [was] overly broad and unduly burdensome." For example, Le objected that certain of the requests for production of documents were "substantially similar" to the company's requests to produce documents of the same description at her deposition, that she had complied with the previous requests at her deposition, and that "further production of such documents [was] burdensome and oppressive." As to the other requests, Le stated that she had no responsive documents in her possession.

On March 14, 2013, Le served responses to Blue Tax's form interrogatories. Le's responses included extensive boilerplate objections and answers. By way of example, Blue Tax propounded form interrogatory 202.1, which asks:

> "Do you contend that any ADVERSE EMPLOYMENT ACTIONS against you were discriminatory? If so:
> (a) identify each ADVERSE EMPLOYMENT ACTION that involved unlawful discrimination;
> (b) identify each characteristic (for example, gender, race, age, etc.) on which you base your claim or claims of discrimination;
> (c) state all facts upon which you base each claim of discrimination;
> (d) state the name, ADDRESS, and telephone number of each PERSON with knowledge of those facts; and (e) identify all DOCUMENTS evidencing those facts.

In response, Le's answer was:

> "In April, 2012, Plaintiff informed Defendant LEWIS that she was concerned about the Defendant BLUE TAX, INC. complying with the IRS rules and regulation that require a tax preparer's signature on a tax return.

5

In fact, Defendant BLUE TAX, INC. would face a fine for each unsigned tax return that was filed. Ms. Hammond responded that her CPA filed her personal taxes electronically and she never signs her tax return. However, the IRS rules and regulations require that all tax preparers need to affix their PTIN (identification) number on the tax return to inform the IRS that they were the ones that had prepared the return. One of Plaintiff's co-workers, Ms. Gandhi ('Gandhi'), did not have a PTIN number and therefore never 'signed' the tax returns that she prepared. Again, this is considered a violation by the IRS and is punishable by a fine per the IRS code.

"On April 19, 2012, Plaintiff was given a written employee warning notice for allegedly creating a hostile work environment for another employee, Ms. Gandhi, and for not following management's directions. Both charges were baseless. Plaintiff unceasingly tried to follow her manager's directions. When Plaintiff asked for an example of the accusations against her, she was told that the reason she was being written up was because she had not followed the directions of management. HAMMOND stated that Plaintiff 'took too much ownership of the tax returns' assigned to her. HAMMOND emphasized that Plaintiff was 'not to worry' about client's issues and/or deadlines and she was spending too much time answering clients' questions and concerns. In addition, Plaintiff asked for an example of the Hostile Work Environment complaint as she was surprised about this as she thought she had a good working relationship with Ms. Ghandi. At that point, HAMMOND called Plaintiff into the office. HAMMOND told Plaintiff that Ms. Ghandi had stated that Plaintiff was 'All over her back and made her feel uncomfortable' but would not be more specific.

"Plaintiff felt frustrated and confused, as she had never before been reprimanded for going above and beyond what was asked of her. In fact, she was in shock and near tears about the false accusations. Plaintiff felt

6

that she was outnumbered and had no choice but to sign the disciplinary write up even though it inaccurately and unfairly misstated the facts in the matter.

"On July 18, 2011, Plaintiff finished the 2007 tax return of a client. Ms. Ghandi emailed Defendants LEWIS and HAMMOND to state that Plaintiff may have incorrectly prepared the tax return. Defendant LEWIS, Defendant GUARACHA and HAMMOND called Plaintiff into a meeting and condescendingly asked her whether she knows how to do tax returns. Defendant LEWIS asked, 'Are you comfortable doing tax schedule A and C?' In the meeting, Ms. Ghandi was brought in and Plaintiff explained to her how she arrived at the 2007 tax return computation on the form which Ms. Ghandi had reported as being incorrectly prepared. Ms. Ghandi listened but did not make any comments. Later on that day, Ms Ghandi realized that she was mistaken about the proper way to prepare the tax returns and she adjusted the client's tax returns according to the directions of Plaintiff. When Ms. Ghandi corrected the tax return it resulted in the client going from being owed a huge refund to owing the IRS tens of thousands dollars. The client had to be informed that she was not going to be getting a refund after all and instead would be owing money. No one ever apologized to Plaintiff for wrongly accusing her of incorrectly preparing the tax return.

"On July 19, 2011, Plaintiff emailed Defendant GUARACHA to request four hours off on July 20, 2011, because she was required to have her fingerprints taken for her U.S. citizenship application. Defendant GUARACHA responded by stating that managers do not accept last minute requests and so she could not have the time off. In fact, Defendant BLUE TAX, INC. had no such policy or rule. In fact, Defendant GUARACHA allowed another employee off with one day notice just the week before. In contrast, Plaintiff was only requesting a half day off to comply with her

7

citizenship process. In Plaintiff's case, Defendant GUARACHA refused to allow her the time off. After intervention from Plaintiff's husband, Ken Ly ('Mr. Ly'), who also worked at Defendant BLUE TAX, Defendant GUARACHA stated that Plaintiff had to come in around 6:00 or 6:30 am or 'as soon as she can thereafter' to work the required hours.

"On July 20, 2011, Plaintiff came into work at 6:50 am, which was as soon 'thereafter' as Defendant GUARACHA had stated the night before. Nonetheless, Defendant GUARACHA called Plaintiff into his office and attempted to give her a disciplinary write-up for being late even though her normal scheduled time to come in was at 8:00 am. Plaintiff's fingerprint appointment was at 2:00 pm so she was planning to work the required six hours from 7:00 am – 1:00 pm, instead of 6:00 am to 12:00 pm (noon). Despite agreeing otherwise, Defendant GUARACHA wrote Plaintiff up for being late. Defendant GUARACHA never communicated to Plaintiff a specific time for her work, only that she had to work six hours before leaving for her appointment. Defendant GUARACHA said he was going to write Plaintiff up for being late but that 'it meant nothing' for her employment record.

"Later that day, Plaintiff found out that Defendant GUARACHA sent an email to the other Defendant BLUE TAX, INC. managers, HAMMOND and Defendant LEWIS, attaching a picture of an ugly, cross-eyed dog, making fun of Plaintiff's eye disability and broken English. Instead of denouncing Defendant GUARACHA's racially derogatory email depicting Plaintiff as a dog, Hammond emailed him back saying 'I hate having to listen to Annie talk. All I see now is the dog picture.' It is significant that HAMMOND implies that from now on when she hears Plaintiff talk with 'broken English' she will be reminded of the dog picture that Defendant GUARACHA emailed out. Defendant LEWIS's response to the derogatory email, as the Vice President of Defendant BLUE TAX,

8

INC., was to reply to the email with 'Lol' meaning 'Laughing Out Loud.' No one in an executive position at Defendant BLUE TAX, INC. discouraged Defendant GUARACHA's racist offensive email. In fact, nothing was done by Defendant BLUE TAX, INC.'s management to address the racially derogatory email.

"The day after the offensive email surfaced, Defendant GUARACHA went through Plaintiff's personal email folder and found an email that she wrote to her husband venting her frustration about Defendant GUARACHA's unfair actions towards her for not allowing her time off even though he allowed other employees off work. Defendant LEWIS called Plaintiff into his office with HAMMOND and Defendant GUARACHA to give her a two day suspension without pay and to hand her a write-up for a 'misuse of company email.' In addition, the write-up stated that during one of Plaintiff's lunch breaks she stated to co-workers, 'this is bullshit, things will never change here.' However, whether or not that statement was true, Plaintiff never made that statement.

"During the meeting referred to in the preceding paragraph, Defendant LEWIS threatened Plaintiff with losing her job. Plaintiff told them she knew about the email making fun of her broken English and her lazy eye. Defendant LEWIS did not deny it, instead; he bragged that, 'We are managers, we have the right to speak or say whatever we want!' Plaintiff responded that she did not think that included making fun of people. Defendant LEWIS again bragged that, 'Yeah, that's why we have a closed door.' Plaintiff told them that since her desk was next to Defendant GUARACHA and HAMMOND she could hear them say her name and then laugh a lot. Defendant LEWIS again stated that it did not matter 'because at the manager level they can do what they want.' Plaintiff informed Defendant LEWIS that she expected them to respect her as a human being. Then Defendant LEWIS snapped at her that she could not

9

even compose a proper sentence. Plaintiff told them she knew they were making fun of her 'cross-eyes' and English. Then they all became quiet. Defendant LEWIS then threatened her stating, 'You are lucky that I did not fire you because I still think you are a good employee.' He then stated, 'you look so upset right now, do you want to work here or not?' Plaintiff did not know what to say but was afraid she was about to be fired, so she answered 'yes.' Defendant LEWIS told her she had to stop questioning management, IRS regulations, and advised her that they would talk on Monday after she returned from her suspension. Defendant LEWIS did not indicate to Plaintiff that they were going to terminate her.

"After the 'suspension,' Plaintiff returned to work on July 25, 2011. When she arrived at work, Defendant LEWIS handed Plaintiff her final paycheck and acknowledged that Plaintiff may have received an email that she should not have received in reference to the dog photograph. Regardless of the racially derogatory email Plaintiff was sent, Defendant LEWIS said the Defendant BLUE TAX, INC. was going to have to terminate her. Defendant LEWIS stated that the Defendant BLUE TAX, INC. would give her a good recommendation letter. Plaintiff was devastated as she felt that she was being terminated because of her race and her disability."

On March 14, 2013, Le served responses to Blue Tax's RFAs. As with her responses to the other discovery, Le's responses included objections, as well as some admissions and denials.[7]

### Blue Tax's Discovery Motion and the Order on the Motion

On April 8, 2013, Blue Tax's counsel wrote to Le's attorney to meet and confer regarding her responses to the RFAs, form interrogatories, and requests for production of documents. The letter requested verifications; demanded that all objections be removed

---

[7] The trial court eventually ruled that Le's responses to Blue Tax's RFAs largely complied with the discovery statutes.

from all three responses, and, in some cases, that additional responses be provided. On April 15, 2013, Le's counsel forwarded verifications signed by Le, and responded to the other demands with the following advisement:

> "Plaintiff is not changing her answers to any of her Responses to the Request for Admissions. She has answered each Request for Admission to the best of her knowledge and understanding of the question as it was phrased. Plaintiff will not waive her valid objections to questions that violate her right to privacy or information protected by the attorney-client privilege.

> "Plaintiff will not waive her valid objections to her answers to the form interrogatories. The judge will make a ruling about the validity of the objections at trial. . . .

> "Plaintiff has not withheld any documents, we merely pointed out in the responses to each production of documents that Defendants are in custody of all the documents that Plaintiff has. As you are aware, most documents originated from the Defendants."

On April 19, 2013, Blue Tax's counsel sent a second letter again asserting that objections could be determined at trial, and demanded answers without objections. The letter set a deadline for April 22, 2013, and stated that Blue Tax would file a motion to compel further responses on April 23, 2013, unless Le fully complied with Blue Tax's demands. On April 22, 2013, Le's counsel replied by a fax and email letter, indicating that Blue Tax appeared to be seeking to compel Le to waive attorney-client privilege, and to compel her to provide different answers than those she had provided in her responses.

On May 16, 2013, at which time trial was set for August 19, 2013, Blue Tax filed a joint motion to compel Le to provide further responses to form interrogatories, requests for production of documents, and RFAs, supported by a Separate Statement of disputed discovery. The motion was set for hearing on September 20, 2013, a month after the calendared trial date.

11

On June 28, 2013, more than a month after filing its discovery motion, Blue Tax filed an ex parte application for an order shortening time for the hearing on the motion. On July 2, 2013, the trial court issued a minute order denying Blue Tax's motion on several grounds, including the "discovery motion cut-off."

On July 16, 2013, it was Le's turn to file an ex parte application for an order shortening time. Le requested the order to file a motion to compel Blue Tax to produce documents at the then-pending deposition of its "person most qualified" (PMQ) to testify,[8] and to file a motion to amend her complaint to add a cause of action under Labor Code section 923 (violation of an employee's right to engage in mutual aid activities). Further, Le requested that the trial date be continued for a minimum of sixty days. Blue Tax filed written opposition to the application. The court set the matter for a full hearing, and directed the parties to submit additional briefing.

On July 26, 2013, the trial court granted "in full" Le's application for an order shortening time to file a motion to amend her complaint, and to file a motion compel Blue Tax to produce documents at the deposition of its PMQ. The court's order indicated that the trial date was reset for October 28, 2013. On August 19, 2013, Le filed a motion for leave to amend her complaint, including a copy of her proposed first amended complaint (FAC).

With the original August 2013 trial date continued, the parties apparently decided it was appropriate to re-approach discovery, including Blue Tax's May 2013 discovery motion (*ante*) to compel Le to provide further responses to form interrogatories, requests for production of documents, and RFAs, which, as noted above, had been scheduled to be heard on September 20, 2013. On September 10, 2013, Le filed a written opposition to Blue Tax's motion to compel further discovery responses.

---

[8] According to papers in the record, Le first noticed a deposition of Blue Tax's PMQ in June 2013. Then, following a series of exchanges to set a date for the deposition, Le's counsel confirmed a date in mid-July. In early July 2013, Blue Tax served Le with objections to the production of documents.

12

On September 20, 2013, the trial court issued an extensive written tentative ruling indicating that was granting Le's motion to amend, and granting Blue Tax's discovery motion in large part. On the same day, the court issued a minute order advising the parties that argument on the motions was continued.

On October 2, 2013, the parties argued Le's motion for leave to file her FAC, and Blue Tax's discovery motion to compel Le to provide further responses to interrogatories, requests for production of documents, and RFAs. At that time, the court kept intact its tentative ruling of September 20, 2013, thereby granting Le's motion to file her FAC, and granting Blue Tax's discovery motion in large part. Specifically, as to Blue Tax's discovery, the court generally rejected Blue Tax's challenge to Le's objections (privilege, burdensome, etc.) on the ground that Blue Tax had failed to challenge Le's objections within 45 days after she had served her objections. Further, the court denied Blue Tax's motion to compel Le to provide further responses to RFAs as follows: "Defendant's motion to compel Plaintiff to provide further responses to [RFAs] (Set One) Nos. 22, 23, 24, 25, 29, and 32 is denied to the extent Defendant challenges the *fact-specific responses* (i.e., whether the answers are evasive or incomplete). Plaintiff's responses comply with C.C.P. §2033.220 . . . ."

As most relevant, the trial court granted Blue Tax's motion compel further responses to form interrogatories numbers 200.2, 200.3, 200.4, 201.1, 202.2, 203.1, 204.1, 205.1, 207.2, 210.1, 210.3, 212.4, 212.5, 213.1, 213.2, 214.1, and 217.1. In addition, the court granted Blue Tax's motion to compel Le to provide further responses to the company's requests for production of documents numbers 1, 2, and 6, directing Le to amend her responses so that they conformed to the statutory language. The court did not explicitly order Le to produce any additional documents.[9] The court denied both parties' cross-requests for sanctions. The court also continued the trial date to March 17, 2014.

---

[9] As noted above, Le's initial responses indicated that she had produced all of the documents in her possession.

On November 12, 2013, at approximately 5:00 p.m., Le's counsel faxed a 31-page set of amended responses (without Le's verification) to Blue Tax's form interrogatories to the company's lawyer, along with amended responses (again without Le's verification) to the company's requests for production of documents. At some point during the day on November 13, 2013, Le signed verifications for the amended response.

***Blue Tax's Further Discovery Motions and the Order Imposing Terminating Sanctions***

On November 13, 2013, Blue Tax filed an ex parte application to "correct" the trial court's discovery order issued on October 2, 2013. Specifically, Blue Tax sought an order with a specified deadline for Le to provide the further responses that the court had ordered her to provide. The court granted Blue Tax's application, and signed a formal written order setting a response deadline of November 27, 2013.

On December 10, 2013, Blue Tax filed an ex parte application to specially set a hearing on a motion for issue, evidentiary and or monetary sanctions against Le for her failure to comply with the trial court's discovery orders. The court set the motion for hearing on January 22, 2014.

On January 8, 2014, Le filed her opposition to Blue Tax's motion for discovery sanctions. Le's counsel submitted a declaration in support of the opposition in which he explained that Le had served a privilege log on Blue Tax, and that it had not challenged any of Le's assertions of privilege. Further, Le's counsel advised the court that Le had served 31 pages of amended responses to Blue Tax's form interrogatories on November 12, 2013, along with amended responses to the request for production of documents. Verifications to both of those responses were served on November 13, 2013. The opposition included a "red line" version of Le's amended responses, showing in red (on the original) the text which was added and deleted from the original responses to the amended ones.

In reply to Le's opposition, Blue Tax argued that Le's amended responses served on November 12, 2013, the day before Blue Tax had found it necessary to seek an order for a specified deadline date for such amended responses, had been tantamount to "no responses at all" because they had not been verified. Blue Tax argued that its lawyers

14

had been regularly required to return to court, incurring costs in the process, to get Le and her counsel to satisfy their discovery obligations.

On January 22, 2014, the trial court issued a tentative order granting Blue Tax's motion for discovery sanctions in the form of monetary sanctions only, and denying the company's motion for terminating sanctions without prejudice.

On January 23, 2014, Blue Tax filed a supplemental brief in support of its motion for terminating sanctions. On the same day, Le's counsel lodged a proposed order denying terminating sanctions, along with a memorandum in support of the order, which indicated that Le had complied with the court's order for supplemental responses by the materials she served on Blue Tax on November 12-13, 2014.

On January 29, 2014, the parties again argued the issue of terminating sanctions to the trial court, and the court took the matter under submission. During the course of argument, Le's counsel noted that the earlier orders did not order production of any documents. Moreover, that Le had produced all of the documents that she had in her possession over a year earlier in her deposition. As counsel stated: "The documents have been produced except those for which a privilege was asserted and a privilege log was provided and except for those for which a valid objection was sustained by the court and for which we said we would not produce documents."

The argument then focused on two main areas of discovery – Le's physical condition (a matter pertaining to her claim of disability discrimination), and the money that she had earned after Blue Tax terminated her (a matter pertaining to her damages). Here, Le's counsel argued to the court that the lack of medical records reflected that Strabismus is a physical condition and not a "sickness or disease to be treated." It was like having "blond hair." As counsel stated: "There isn't something more that we can produce to them." Counsel argued that, with respect to documents related to Le's finances, Blue Tax was asking for documents to which the court had already sustained objections, such as Le's private financial documents, as reflected in the court's October 2, 2013 order. Ultimately, Le's counsel summarized the situation as follows: "There isn't anything here that's being hidden. It's a very compact case. . . . You'll see in the

15

document production the offensive picture of a dog they were circulating [about] my client . . . . You'll see it when you look. [¶] It doesn't take much more than that for a harassment [claim] . . . . This [motion to compel further discovery responses] is sort of a disguised motion for summary judgment [arguing] we haven't [got any] witnesses or documents."

On March 17, 2014, about a month and a half after the hearing on the issue of terminating sanctions, the trial court issued a minute order taking the trial date and final status conference off calendar, and setting a "non-appearance case review re: proposed orders" for April 18, 2014. The matter was continued several times, until finally being resolved on May 29, 2014.

On May 29, 2014, the trial court issued a minute order directing Le to file a response to Blue Tax's proposed order for terminating sanctions, and directing Blue Tax to file a response to Le's proposed for denying terminating sanctions. The supplemental papers were due by July 15, 2014, and the non-appearance case review was reset again for July 25, 2014, "for the Court to make a ruling on the Proposed Orders." On July 15, 2014, Blue Tax and Le each filed objections to the other party's proposed order.

On August 14, 2014, the trial court signed and entered a 23-page typed order (prepared by Blue Tax's counsel) granting Blue Tax's motion for discovery abuse terminating sanctions. In a handwritten addendum to the order, the court handwrote the following statement: "In deference to the many decisions of our Honorable Justices this decision was not made lightly. Plaintiff was given more than enough time and opportunity to resolve the issues."

Le filed a timely notice of appeal.

## DISCUSSION

### I. The Trial Court Exercised Its Discretion

As noted above, the trial court signed a 23-page typed order that was prepared by Blue Tax's attorney. On this order, below the signature line, the court appended a short, handwritten note that reads in full: "In deference to the many decisions of our Honorable Justices this decision was not made lightly. Plaintiff was given more than enough time

16

and opportunity to resolve the issues." Le argues this handwritten note "shows that the [trial court] simply 'punted' this case to the Court of Appeal, implicitly acknowledging that it would be reviewed and possibly reversed."

We summarily reject Le's argument. The trial court's handwritten note does not demonstrate that it left its decision to any other court. Rather, we interpret the court's note to show its recognition that a number of published appellate cases have regularly cautioned trial courts not to impose terminating sanctions without weighted reasons. The note shows that the trial court understood the gravity of the decision that it had been called to make; it does not show the court shirked its judicial responsibilities and simply wanted to move the issues along to a reviewing court. Whether or not the record supports the ruling issued by the trial court is a different matter which we take up next.

## II. The Trial Court Erred in Issuing Terminating Sanctions

Le argues that the trial court erred in issuing its order imposing terminating sanctions for discovery abuse because the order is not supported by substantial evidence. Alternatively, Le argues the trial court abused its discretion by imposing terminating sanctions in the first instance. We agree the court should not have dismissed Le's case.

*Governing Principles*

"California discovery law authorizes a range of penalties for conduct amounting to 'misuse of the discovery process,'" including terminating sanctions. (*Doppes v. Bentley Motors, Inc*. (2009) 174 Cal.App.4th 967, 991, quoting Code Civ. Proc., § 2023.030.) Misuses of the discovery process include the following: "(d) Failing to respond or to submit to an authorized method of discovery. [¶] (e) Making, without substantial justification, an unmeritorious objection to discovery. [¶] (f) Making an evasive response to discovery. [¶] (g) Disobeying a court order to provide discovery." (Code Civ. Proc., § 2023.010.) Terminating sanctions may take the form of "[a]n order dismissing the action, or any part of the action . . . ." (Code. Civ. Proc., § 2023.030, subd. (d)(3).)

17

"'The power to impose discovery sanctions is a broad discretion subject to reversal only for arbitrary, capricious, or whimsical action.'" (*Do It Urself Moving & Storage, Inc.* v. *Brown, Leifer, Slatkin & Berns* (1992) 7 Cal.App.4th 27, 36.) The trial court may order a terminating sanctions for discovery abuse "after considering the totality of the circumstances: [the] conduct of the party to determine if the actions were willful; the detriment to the propounding party; and the number of formal and informal attempts to obtain the discovery." (*Lang v. Hochman* (2000) 77 Cal.App.4th 1225, 1246.) Generally, "[a] decision to order terminating sanctions should not be made lightly. But where a violation is willful, preceded by a history of abuse, and the evidence shows that less severe sanctions would not produce compliance with the discovery rules, the trial court is justified in imposing the ultimate sanction." (*Mileikowsky v. Tenet Healthsystem* (2005) 128 Cal.App.4th 262, 279-280.) Under this standard, trial courts have properly imposed terminating sanctions when parties have willfully disobeyed one or more discovery orders. (*Lang v. Hochman*, *supra*, 77 Cal.App.4th at pp. 1244-1246 [discussing cases].)

When the trial court's exercise of its discretion relies on factual determinations, we examine the record for substantial evidence to support them. (*Waicis v. Superior Court* (1990) 226 Cal.App.3d 283, 287; see *Miranda v. 21st Century Ins. Co*. (2004) 117 Cal.App.4th 913, 929.) In this regard, "the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination [of the trier of fact]." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874, italics omitted.)

First, we find there was no substantial evidence to support some of the significant factual determinations upon which the trial court relied in imposing terminating sanctions. The trial court's very extensive written order, which, as noted above, was prepared by Blue Tax's lawyers, states that Le "persistently . . . refused to engage meaningfully in discovery and willfully . . . refused to comply with [the trial] court's orders compelling her full and complete compliance therewith." In the latter vein, the order for terminating sanctions repeatedly refers to a prior court order dated October 2,

2013, and a prior court order dated November 13, 2013.  We agree with Le that the trial court seems to have incorrectly assumed that it had issued multiple prior discovery orders before it decided to issue its order imposing terminating sanctions.  We see only one discovery order issued prior to the order imposing terminating sanctions, namely, the court's order dated November 13, 2013, which formalized its tentative ruling of October 2, 2013.  While we do not countenance a failure to obey a discovery order,  the record here fails to support the trial court's finding that Le violated multiple discovery orders, justifying imposition of the ultimate sanction.

The trial court's order imposing terminating sanctions also states that Le "produced no documents whatsoever" in her March 2013 responses to the requests for production of documents propounded by Blue Tax in January 2013, or at any time for that matter.  This finding is supported by the record in a technical sense, but Le's discovery failure must be viewed in light of her repeatedly asserted position that she had produced all of the documents that she had in her possession at her deposition.  While Le erred in flatly refusing to produce documents on the ground that Blue Tax already had in its hands the documents which were the subject of its request for production of documents (*cf. Singer v. Superior Court* (1960) 54 Cal.2d 318, 324 ["[N]o rule or authority is cited which authorizes refusal to answer an interrogatory simply upon the ground that the answer is known to the party seeking the information."]), the issue in examining the order imposing terminating sanctions is not merely Le's failure to comply with her discovery.  Blue Tax was entitled to pursue a discovery plan as it saw fit, and Le was not entitled to refuse to cooperate on the grounds she thought the discovery was unnecessary.  Her objection that producing some 40 or so documents was "unduly burdensome" smacks – in the words of the trial court's terminating order – of "gamesmanship" that is not acceptable.  Compliance, however, did not require threat of dismissal.

Beyond the matter of compelling Le to produce documents pursuant to a request for production of documents, we note a further issue is presented by Blue Tax's motion for the imposition of terminating sanctions.  In the event Le does not actually have any

19

documents to produce that are responsive to a particular aspect of Blue Tax's request for production of documents, then so be it, and a proper discovery response is that she has no such documents. She must merely give an explanation that no such documents ever existed, or to explain why she does not have such documents, for example, a document was always in the possession of Blue Tax. (*Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 580, fn. 3 [a party has a duty to respond to discovery requests "as completely and straight forwardly as possible given the information available to them."]) If Le says that no more documents exist, then there is no more discovery to be had, and no dereliction of her discovery obligations in not producing such documents. Of course, if she later tries to introduce documents, for example, in opposition to a motion for summary judgment or at trial, then there would be grounds for the trial court to refuse to allow her to use such documents. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 855.) But a proponent of discovery does not show a party's failure to comply with discovery obligations merely by pointing to the party's failure to provide discovery, particularly in light of an assertion that there is nothing to provide. Le's lack of documents to produce may well show that she cannot prevail on many, if not most or all of her causes of action, but this is a matter for procedures beyond those available under the discovery statutes, for example, a motion for summary judgment or summary adjudication of issues, or motion in limine or motion for nonsuit at trial. The trial court has within its authority the power to hold Le firmly restricted to her limited discovery responses, without imposing a terminating sanctions under the discovery statutes.

The trial court's order imposing terminating sanctions also states that, with respect to the "majority" of the discovery sought by Blue Tax on the material factual allegations of Le's claims, that is, with respect to the company's contention discovery, she "refused" to provide "full and complete good faith factual responses." Le's discovery responses are subject to more interpretation than is embodied in the court's finding here. Le provided responses, and provided amended responses as reflected in her "red line" copy of discovery responses. Again, we note that, to the extent Le has disclosed all of the facts that she has, then she has no further obligation with respect to complying with discovery.

20

Of course, as we stated above, whether Le's responses show facts that would support any of her claims against Blue Tax is a different issue. If Le later tries to introduce evidence of facts beyond her discovery answers, she will be subject to the consequences we have outlined.

We could go on, but think we have made our point. Where we do agree with the trial court's order is in its finding that Le "continues to refuse to set forth material facts or documents supporting her contention that she has suffered any financial loss" as a result of Blue Tax's decision to fire her, and or her contention that she "will suffer any [such loss] in the future" as a result of being fired. Blue Tax's discovery sought information from Le reflecting the income that she received from operating a business known as ATTAX Financial after she was fired. Le consistently asserted that such information was personal and did not need to be disclosed. Blue Tax plainly is correct that information about Le's income was discoverable as it could have relevance to mitigation of her claimed damages. (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026.) Blue Tax's discovery requests may have been overly broad, and may have invaded privacy interests of third-parties, e.g., in seeking names of any payments by ATTAX's clients, but Blue Tax was correct that Le could not flatly refuse to provide facts concerning *her* income as it may be relevant to her claim for loss from being fired by the company. (*Stadish v. Superior Court* (1999) 71 Cal.App.4th 1130, 1145; accord, *Nativi v. Deutsche Bank National Trust Co*. (2014) 223 Cal.App.4th 261, 317.) If, after being terminated by Blue Tax, Le was able to dedicate more time to ATTAX, and to improve her financial condition, then there was no loss caused by anything Blue Tax did. In truth, we see a lot of unproductive discovery posturing by both sides in this case.

We also find unsupported the trial court's statement that Le "spent the better part of 12 months avoiding and evading its obligations to fully and completely respond." Yes, the better part of a year passed in dealing with Blue Tax's first round of propounded discovery, but most of that time cannot be attributed solely to Le's conduct. Blue Tax propounded the discovery in late January 2013, and Le responded in March 2013. Blue Tax filed a motion to compel further discovery responses in May 2013, but the trial court

21

did not address the motion until it issued a tentative ruling in September 2013. The tentative ruling was not formally adopted as an order until October 2013. Le filed supplemental responses in November 2013. Blue Tax filed a motion for terminating sanctions in December 2013. The trial court heard arguments on the motion for terminating sanctions in January 2014 (the one year anniversary of the discovery). The trial court entered its order for terminating sanctions in August 2014. The record does not support the trial court's conclusion that the lengthy delay from the beginning to the end of the discovery issues in this case were caused by Le or her counsel. We need not dwell on the myriad causes for the delays in this case, but the record does not support the conclusion that the liability for those delays must fall solely at Le's feet.

The trial court's order imposing terminating sanctions against Le also states that Blue Tax "suffered extreme prejudice" from Le's failure to provide discovery responses to the company. This statement, too, is not supported by the record. Blue Tax had the opportunity and time to prepare its defense to Le's claims, particularly given the relatively limited facts and witnesses identified in Le's discovery responses. To the extent Le's discovery responses show that she has no facts in support of certain of her claims, Blue Tax has not shown us how this is prejudicial to its defense.

Second, we find the trial court abused its discretion in determining that terminating sanctions, rather than some other lesser sanction (for example a monetary sanction), would have persuaded Le to comply with the discovery orders. Discovery sanctions are not intended to serve the primary purpose of damaging a party's case because he or she is guilty of a discovery abuse, but to promote the end goal of assuring that a party who propounds discovery will receive proper responses, and to curb the type of discovery abuse which occurred. (See generally *Laguna Auto Body v. Farmers Ins. Exchange* (1991) 231 Cal.App.3d 481, 488; *Doppes, supra,* 174 Cal.App.4th at p. 992; *Biles v. Exxon Mobil Corp*. (2004) 124 Cal.App.4th 1315, 1327.) We have affirmed terminating sanctions upon finding that the ultimate sanction was appropriate in the first instance, without a violation of a prior court order, due to the egregious nature of the discovery violation In *Williams v. Russ* (2008) 167 Cal.App.4th 1215, the plaintiff's

willful conduct caused the destruction of evidence which may have been useful to the defendant's case, thus making the evidence unavailable to be produced in discovery. In the current case, however, we are not persuaded that Le's conduct is of a similar nature justifying a terminating sanctions.

## III.    Costs

After the trial court entered its judgment of dismissal (see footnote 1, *ante*), Blue Tax submitted a cost bill. Le filed a motion to tax costs. On January 21, 2015, the court granted Le's motion in part, striking $1,488.15 in costs claimed by Blue Tax. In the end, the court entered an order awarding $5,439.85 in costs to Blue Tax.

On appeal, Le argues that the trial court should not have awarded any costs to Blue Tax in the absence of a finding that she brought or continued litigating her FEHA action without an objective basis for believing it had potential merit. Le's argument is based on the Supreme Court's recent decision in *Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97 (*Williams*). In *Williams*, the Supreme Court ruled that Government Code section 12965 precludes an award of costs in a FEHA case in favor of a prevailing defendant unless the plaintiff brought or continued litigating his or her action without an objective basis for believing it had potential merit. The Supreme Court decided *Williams* while Le's current appeal was pending. This means, of course, that *Williams* did not play a part in the trial court's decision on costs.

Because we have determined that the judgment of dismissal based on terminating sanctions for discovery abuse must be reversed, we find the accompanying award of costs must be reversed as well, regardless of whether or not *Williams* is applicable here. In the absence of a final determination of Le's case, the issue of costs is premature. We reject as moot Blue Tax's argument that Le should not be allowed to raise her challenge to the award of costs on appeal because she did not raise Government Code section 12965 as a ground for disallowing costs in the trial court.

## DISPOSITION

The judgment of dismissal is reversed.  Appellant is awarded costs on appeal.


                                     BIGELOW, P.J.

We concur:


RUBIN, J.


GRIMES, J.